Eviston vs. Cramer and others.

Eviston vs. Cramer and others.

*April 9 — May 31, 1883.*

Libel. *(1, 4) Punitory damages: special verdict. (2) Privilege. (3) Responsibility of principal for malice of agent.*

1. A special verdict in an action for libel, finding that the article in question was false and was published with the intent to injure the plaintiff's feelings and to degrade him in the estimation of the public, is *held* insufficient to justify the award of punitory damages. The question whether the publication was prompted by special ill-will or bad intent towards the plaintiff should have been submitted to the jury, and they should have stated in their special verdict the facts upon which punitory damages were predicated.

2. A newspaper article stating, among other · things, that it was charged against the plaintiff that while holding the office of sealer of weights and measures he had made a practice of tampering with the weights of scales in order to swell the fees of the office, is *held* not to have been privileged.

3. A principal is not responsible in exemplary damages for the actual malice of his agent, unless he has participated in or ratified and confirmed the malicious act.

4. *Per* CASSODAY, J.   Where there is evidence sufficient to warrant the . assessment of punitory damages the better practice would seem to be to require the jury to find the amount of such damages sepa- . rately.

APPEAL from the Circuit Court for *Milwaukee* County.

Action for libel.   The cause was before this court on former appeals and is reported·in 47 Wis., 659, and 54 Wis., 220.   The newspaper article in question was written by one Louis Bleyer, a local reporter employed by the defendants, and was as follows:

### "HE WANTED FEES.

#### "SOME CHARGES OF IRREGULARITY ALLEGED AGAINST THE EX-SEALER OF WEIGHTS AND MEASURES.

" At the meeting of the common council this afternoon Alderman Wolf will endeavor to secure an investigation of the manner in which the late sealer of weights and measures, *Martin Eviston,* performed the duties of the office, with the view of putting the new incumbent under bonds not to follow in the footsteps of his ' unterrified ' predecessor.   *Martin* belongs to the Third ward rabble who voted as a unit to make the Hon. John Black mayor.   It is a long time since this specimen of Third ward democracy had a chance to hold an office of any kind, and no one need wonder much, therefore, that he resolved to make the most of it and the accompanying perquisites.   The law requires the sealer of weights and measures to inspect all scales in use in the city semi-annually, and allows him certain fees for work performed while fulfilling this duty.   It is charged against *Eviston* that he deliberately made a practice of tampering with the weights of scales in order to swell the fees of the office; that he almost invariably found the weights either

too light or too heavy, and would drill them either to reduce the weight, or to increase it with a filling of lead; and more than all, it is charged that he managed to find the weights wrong on each visit, so that the 'doctoring' could be resorted to and fees collected. It is charged that he injured the scales in Messrs. Kershaw & Manegold's grain elevator, on the South Side, to such an extent that it became necessary to send to the manufactory for an expert to restore them to a condition of perfect accuracy. And the developments in relation to *Eviston's* 'cussedness' are said to be entirely due to the presence of this expert in the city last week. He claims that all weights provided for scales are carefully tested before leaving the manufactory, and must, therefore, be more correct than any the sealer can make them with any test he may have here. Furthermore it does not stand to reason that a weight will increase in bulk by frequent use, and therefore the drilling process practiced to reduce them was doubtless merely a sham and a delusion to enable him to collect an additional fee.

"In order to satisfy himself of the truth of some of the irregularities charged against this man *Eviston*, a *Wisconsin* reporter called at the store of Messrs. King & Degner, dealers in groceries and vessel supplies on South Water street, and was shown two sets of scale-weights that had been in use for ten years previous to *Mr. Eviston's* appointment, and always been found correct when examined. The latter, however, pronounced them wrong on his first visit, drilled holes in them, and filled the holes with sheet lead, which he managed to double upon the surface in the shape of an ugly-looking patch. For this 'doctoring' he asked and received two dollars and a half. Last fall *Eviston* made another visit to the store only to find the weights 'out of kilter.' So more drilling was done, more sheet lead applied, and another fee of two dollars and a half collected. And now Messrs. King & Degner are at a loss to know whether they are swindling

Eviston vs. Cramer and others.

somebody or being swindled themselves whenever they use the weights!

"The above is said to be only one of many similar cases. As the story runs, this man *Eviston* visited a certain drug store on East Water street while acting as sealer, and wanted to regulate the scales in use there by the drilling process, but was promptly and forcibly shown into the street. Others were less vigorous in their treatment, and consequently must provide themselves with new sets of weights in order to conduct their business properly.

"It remains to be seen whether the Democratic members of the common council will have the nerve to expose these nefarious practices which are alleged against one of their kind."

Upon the trial the defendants demanded a special verdict and requested that the following question, among others, be submitted to the jury: "Were the defendants actuated by any ill-will, hostility, bad motive, or malicious feeling against the said plaintiff in the publication of the said article?" The court denied the request as to such question, and submitted to the jury, for the special verdict, five questions which, with the answers made thereto by the jury, were as follows:

"1. Was the article set forth in the complaint published in The Evening Wisconsin, the newspaper mentioned in the complaint in this action, on the 27th day of May, 1878? A. Yes.

"2. Were the defendants, at the time of said publication, the proprietors and publishers of said newspaper, The Evening Wisconsin? A. Yes.

"3. Was the article so published false? A. Yes.

"4. Was the said article published with the intent to injure the plaintiff and disgrace him in the estimation of the public? A. It was.

"5. Has the plaintiff suffered damages by reason of the publication? If so, how much? A. Two thousand dollars."

Other facts will appear from the opinion. A motion to set aside the verdict and for a new trial was denied, and from a judgment entered on the verdict in favor of the plaintiff, the defendants appealed.

*J. J. Orton*, for the appellant, contended, *inter alia*, that the publication was privileged, as being a statement and fair criticism by a public journal of a public matter in reference to a public man charged with irregularities before a public body. Starkie on Slander, secs. 246, 248, 255, 262, 269–272; Odgers on Libel, 34–43; Townsend on Slander & Libel, 485; *Noonan v. Orton*, 32 Wis., 106; 17 N. Y., 190.

For the respondent there was a brief by *Cottrill, Cary & Hanson*, and oral argument by *Mr. Hanson*.

COLE, C. J. It is to be regretted, in this case, that the special verdict does not cover more issues or facts than it does. There were really but three controverted issues or questions submitted. In answer to them the jury find that the article in question, published by the defendants, was false; that it was published with the intent to injure the plaintiff's feelings, and to degrade him in the estimation of the public; and the amount of damages which he had suffered by reason of its publication. Now, what inference must we make from these findings? Can we infer anything more than that the jury found from the evidence that the matters stated in the article, of and concerning the plaintiff, were untrue; that the defendants had shown no legal excuse or justification for publishing it; and that the plaintiff had sustained actual damages thereby to the amount given? By actual damages must be understood pecuniary compensation for injury to his feelings; injury to his reputation by being degraded or lessened in public esteem, in consequence of the

publication of the libel, including, of course, mental suffering, so far as the same could be estimated in money. This is the reparation which the law would require the defendants to make for their wrongful act. And we cannot presume, in view of the questions submitted, that the jury considered any other matters in estimating the plaintiff's damages. That being the case, the verdict appears to us excessive, and out of all proportion to the actual damages proven. It is true, in this class of cases, actual malice, or a bad and wicked motive on the part of the defendant, may be shown to enhance the damages beyond mere compensation.

This court and other courts have sanctioned punitory damages by way of punishment to the defendant and for a public example where the act complained of was characterized by a bad motive or a malicious intent. But what fact in the special verdict warrants such damages under that rule? The facts in the special verdict, as we have said, are that the article was false, and was published with intent to injure the plaintiff's feelings, and to degrade him in public estimation. But this is the implied malice which the law imputes to a charge made that is false and injurious to another, and where no proper motive appears for making it. "In all ordinary cases, if the charge complained of is injurious and no justifiable motive for it is apparent, malice is inferred from the falsity of the charge. The law in such case does not impute malice not existing in fact, but presumes a malicious motive for making a charge which is both false and injurious where no other motive appears." Selden, J., in *Lewis v. Chapman*, 16 N. Y., 372. But ill-will, bad motive, or malevolent intent are elements of the wrong where punitory damages are allowed. And these are something more than the implied malice or the malice which the law imputes to a false and injurious charge or accusation which is not privileged. In order, therefore, to justify punitory damages in this case, the question should have been submitted whether the evi-

dence showed that the defendants were prompted by special ill-will or bad intent towards the plaintiff in making the publication. The jury should have stated in the special verdict the facts upon which punitory damages were predicated, so that the court could determine from the verdict whether they had been properly allowed. It was not enough for the jury to find that the charge was false and was published with intent to injure, because this only means or implies the legal malice which the law infers from the falsity of the charge.

It is true, there is some refinement or subtlety of reasoning in some of the cases, calculated to show that malice in law and actual malice are in their nature the same, only differing in the modes of proof by which they are established. Be this as it may, in the affairs of life and in the redress of legal wrongs a distinction is made. If A. publishes a false and defamatory article charging B. with the commission of some offense or immoral conduct, declaring that he does so for the purpose of inflicting mortification and mental suffer-ing, to ruin B.'s credit as a business man, and destroy his good name and fame among his neighbors, is not A.'s guilt greater than it would be had he made the publication without any such ·bad intent or motive, repeating, perhaps, a charge which he had heard and supposed to be true? It seems· to us so. And while it is the law that B., in the latter case, should have full compensation for the actual damages he sustained by the libelous publication ( *Wilson v. Noonan*, 35 Wis., 321–350), in the other the bad motive or declared intent to inflict injury and destroy all that makes life desirable are deemed circumstances of aggravation to enhance the damages which B. is entitled to recover. So, under the circumstances, we are constrained to hold that there was not a proper submission of the issue whether the defendants in making the publication were prompted by ill-will or bad intent towards the plaintiff. The facts found in the special verdict do not justify punitory damages. It ·is evident that

this is a material issue, and the failure of the court to submit it, especially when a request was made that it should be submitted, was well calculated to prejudice the defendants. The cases to which we are referred by the learned counsel for the plaintiff on this point, to show that there was no error on the part of the court in refusing to submit that issue, do not apply.

We will only notice one or two other points discussed by counsel for the guidance of the court on another trial. We think there was no error in the charge holding that upon the undisputed evidence it appeared the article was not a privileged communication. It clearly was not. *White v. Nicholls,* 3 How., 266; *Hamilton v. Eno,* 81 N. Y., 116; *Foster v. Scripps,* 39 Mich., 376. The court properly held that evidence produced on the part of the defendants which tended to show their ignorance of the publication; that there were complaints when the article was so published among the business men of the city as to the manner the plaintiff had tested and changed their weights and scales while in office,— were matters in mitigation of punitory damages. But there was one error in the charge so vital that we deem it proper to be noticed lest it shall again be repeated. At the request of the plaintiff the court charged that if the jury found that the article was written and published maliciously by the witness Bleyer, then the defendants were responsible in damages for such malice, even though they were ignorant of the article until after it was published, and had no personal malice themselves against the plaintiff. This charge obviously made the defendants liable for the wilful and malicious act of their agent, the writer, Bleyer, though they were entirely ignorant of the article until it was published, and had themselves no personal malice against the plaintiff. The actual malice of the agent was imputed to the principals, who were held responsible for the malevolent act to the same extent as though they had themselves written and published

the article. Punitory damages might be given against them under this rule, however innocent they might be of any bad motive or bad intent. Such is not the law in this state, whatever may be the rule elsewhere.

In *Craker v. C. & N. W. Railway Co.*, 36 Wis., 658–675, the learned chief justice, in considering this question, says: "It is said in *M. & M. Railroad Co. v. Finney* [10 Wis., 388], that the plaintiff in such a case is not entitled to exemplary damages against the principal, for the malicious act of the agent, without proof that the principal expressly authorized or confirmed it. Without now discussing what would or would not be competent or sufficient evidence of such authority or confirmation, we may say that we have, on very mature consideration, concluded that the rule in *Railroad Co. v. Finney* is the better and safer rule. We are aware that there is authority, and perhaps the greater weight of authority, for exemplary damages in such cases, without privity of the principal to the malice of the agent; and that reasons of public policy are strongly urged in support of such a rule. *Goddard v. G. T. Railroad Co.*, 57 Me., 202; *Sanford v. Eighth Ave. Railroad Co.*, 23 N. Y., 343; *Jeffersonville Railroad Co. v. Rogers*, 38 Ind., 116; and other cases. But we adhere to what is said on that point in *Railroad Co. v. Finney*. We think that in justice there ought to be a difference in the rule of damages against principals for torts actually committed by agents in cases where the principal is, and in cases where the principal is not, a party to the malice of the agent. In the former class of cases the damages go upon the malice of the principal — malice common to principal and agent. In the latter class of cases the recovery is for the act of the principal through the agent, in malice of the agent not shared by the principal; the principal being responsible for the act but not for the motive of the agent."

This rather lengthy quotation clearly states the rule upon

this question adverse to the view held by the learned circuit court. And it must be deemed the settled law of this state that the principal is not responsible in exemplary damages for the actual malice of the agent, unless he has participated in, or ratified and confirmed, the malicious act of the agent. Of course, if the principal authorizes or directs the wrongful act, then his own bad intent will be imputable to it. It is said the answer states that Bleyer was directed by the defendants to inquire into the matter of the charges and investigation of the plaintiff's conduct, write out the result of his examination, and publish it; therefore they ought to be held responsible to the full extent he would be. We cannot adopt that view. We cannot presume, from what is stated in the answer, that the defendants authorized or expected their reporter would write and publish a false and malicious libel upon the plaintiff. The reporter's employment ought not to be held as authorizing him to do any such thing.

Without dwelling longer upon the case, we think the judgment of the circuit court must be reversed, and a new trial awarded.

Cassoday, J. Concurring in the opinion of the chief justice, it is well enough, perhaps, to add what to my mind is an additional reason for reversal. The court charged the jury, in effect, that if they found that the article as published was false, malice would be presumed in the publication of it; but that the plaintiff had offered no evidence of such malice save the article itself, and that it was for them to say whether the article itself proved any special ill-will, malice, or motive on the part of the defendants against the plaintiff in such publication. The court also charged the jury, in effect, that everything contained in the article injurious to the character of the plaintiff was presumptively false. Thus the jury were informed that they might find special ill-will from the article

itself, in case they found it to be false, and that they might find it to be false because it contained statements injurious to the character of the plaintiff. The court also charged the jury, in effect, that such implied malice entitled the plaintiff to compensatory damages, regardless of the intent of the publishers, unless such intent had been disproved, or unless the article was a fair and honest criticism; and that if it was published with such intent to injure, then, in addition to actual damages, the jury might and ought to give him exemplary damages. Thus the jury were expressly authorized to find the falsity of the article, and also the malice of the publishers, from mere publication, and then from 'such finding alone allow compensatory damages, and also in addition exemplary damages, to be reduced by mitigating circumstances, if, in their judgment, there were any. The court directed the jury to find that the article was published in the paper named, and that the defendants were the proprietors and publishers, and they also found that the article was false, and published with the intent to injure, and assessed the damages. These were the only questions submitted to the jury. There was no general verdict. From this special verdict it is impossible to tell whether the jury allowed exemplary damages, and, if they did, whether they reduced the same by mitigating circumstances, or whether there were any such circumstances, and if so, in what they consisted. The jury were told, in effect, that if the defendants proved that the publication was without any intent to injure, then their verdict must be for the defendants; but they found specially that there was such intent, and had been told that from such implied intent (not disproved) the plaintiff was entitled to compensatory damages, unless the article was a fair and honest criticism; but no question was put to the jury authorizing them to determine whether it was a fair and honest criticism or not.

If the court was correct in giving that, and some of the other instructions above referred to, of which there may be some doubt, then some questions should have been submitted to the jury covering those propositions, for it is well settled that in the absence of a general verdict the special verdict should include all of the material issues in the case. *Hutchinson v. C. & N. W. Railway Co.*, 41 Wis., 542. The defendants requested the submission of some of these questions, and if the portions of the charge referred to were correct, then they should have been given, although most of their requests were properly disallowed. The statute makes a special verdict one by which the jury find the *facts only*, leaving the judgment to the court. Sec. 2857, R. S. A general verdict, on the contrary, is one by which the jury pronounce generally upon all or any of the issues. Ibid. Here the questions submitted did not, on the theory of the charge, cover all the issues involved. The jury were instructed upon some issues which they could not determine by answering the questions submitted, and were instructed upon other propositions which they could not determine except by pronouncing upon them generally by way of assessing damages, and to that extent that finding was a substitute for a general verdict. Where there is evidence sufficient to warrant the assessment of punitory damages, the better practice would seem to be to require the jury to find the amount of compensatory damages, and then a separate question requiring them to find specifically the amount of punitory damages, as in *Bass v. C. & N. W. Railway Co.*, 42 Wis., 657. By so doing, the rules applicable to each class of damages can be given in the charge to the jury in a way less likely to confuse and mislead them. Some portions of the charge seem to be inconsistent with others; as, for instance, in one place the jury were told, in effect, that the article was libelous *per se*, and in another, that it was for the jury to judge whether it would bear that construction or not. But such of these as were more favor-

able to the defendants than to the plaintiff, could work no injury to the former.

*By the Court.*— The judgment of the circuit court is reversed, and a new trial awarded.