# A. S. ABELL COMPANY *v.* INGHAM.*

LIBEL AND SLANDER; NEWSPAPERS; PRINCIPAL AND AGENT; EXEMPLARY
  DAMAGES; APPEAL AND ERROR; MODIFICATION OF JUDGMENT.

1. A newspaper article is libelous *per se* of the superintendent of insurance
   of this District as tending to bring him into contempt and disgrace,
   which states that he was removed from office by the Commissioners
   of the District of Columbia upon the introduction of a resolution in
   Congress to investigate two insurance companies doing business in
   the District, the office of the superintendent of insurance and a firm
   of insurance agents. (Citing *Norfolk & W. S. B. Co.* v. *Davis,* 12
   App. D. C. 306, and *Washington Herald Co.* v. *Berry,* 41 App. D. C.
   322.)

2. Exemplary or punitive damages, being awarded, not by way of com-
   pensation to the sufferer, but by way of punishment to the offender,
   and as a warning to others, can only be awarded against one who has
   participated in the offense; and the principal, therefore, although,
   of course, liable to make compensation for injuries done by his agent
   within the scope of his employment, cannot be held liable for exem-
   plary or punitive damages, merely by reason of wanton, oppressive,
   or malicious intent on the part of the agent. (Citing *Norfolk & W.
   S. B. Co.* v. *Davis, supra.*)

3. In an action against a newspaper corporation for the publication of a
   libelous article in its newspaper, the defendant cannot be held liable
   to the plaintiff for exemplary damages where the article printed
   was written by an out-of-town correspondent, and published without
   the knowledge of the corporation or its manager of its character,

---

*Libel—Liability of Principal—Exemplary Damages.*—For cases pass-
ing upon the liability of newspaper proprietor for libel published without
his knowledge, see note to *State* v. *Mason,* 26 L.R.A. 779; and as to lia-
bility of editor or manager of newspaper for libel published without his
knowledge, see note to *Folwell* v. *Miller,* 10 L.R.A. (N.S.) 332. The au-
thorities passing upon master's liability for exemplary damages for libel
by servant are reviewed in the note to *Forrester* v. *Southern P. Co.* 48
L.R.A. (N.S.) 62.

*Libel—Retraction—Damages.*—For cases passing upon the sufficiency
of retraction to reduce damages, as question for court or jury, see note to
*Lawrence* v. *Herald Pub. Co.* 25 L.R.A. (N.S.) 796.

D. C.]                        Statement of the Case.

and upon being apprised of the falsity of the article the corporation caused a refutation to be published, and offered the plaintiff to and did publish a correction. (Citing *Norfolk & W. S. B. Co.* v. *Davis, supra.*)

4. Where, in an action of libel, the jury returned a verdict for the plaintiff for $6,000, assessing $5,000 as compensatory and $1,000 as punitive damages, and this court found that the lower court erred in permitting the jury to award punitive damages, the judgment was reversed unless the plaintiff should remit $1,000, in which event it was modified to that extent and affirmed, each party to pay his own costs in this court.

No. 2807.   Submitted May 4, 1915.   Decided May 24, 1915.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for an alleged libel. Affirmed on condition that the appellee should remit a part of the judgment recovered.                                          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an action for damages brought by plaintiff, George W. Ingham, against the A. S. Abell Company, publishers of the Baltimore Sun, for the publication of a libel in that paper December 14, 1912. The publication complained of is as follows:

Ingham is Removed.

Impending Insurance Scandal in Washington Causes Dismissal.

House to Sift Alleged Fraud.

Congressman Johnson Introduces Resolution for an Inquiry After Quiet Personal Investigation.

(From the Sun Bureau.)

Washington, December 13.—A casual inquiry made some

months ago by a wary constituent of Representative Ben Johnson, residing at Painesville, Meade county, Kentucky, began an investigation that has ended in an impending insurance scandal, which promises to reach out into high political and social circles in the District of Columbia.

As a culmination of a private inquiry, Mr. Johnson, in his capacity as chairman of the District committee, introduced a resolution to-day providing for a drastic investigation into the affairs of two insurance companies here; and, just as he was taking this action, Commissioner Judson, in the Municipal Building, was signing an order removing from office Superintendent of Insurance Ingham.

The resolution will come up under special rule to-morrow, and the House is expected to order an immediate investigation. Developments are expected to entangle a United States Senator, a member of the District bench, an official of the District other than the insurance superintendent, candidates for the inaugural chairmanship, and many others prominent in financial and social affairs here.

Mr. Johnson's resolution provides that the two companies and all their affairs be investigated, and that the same inquiry be made into the affairs of the superintendent of insurance and a firm of Washington real estate brokers. The resolution gives the District of Columbia or any of its subcommittees power to examine the books, records, and documents of all named in the resolution, to appraise their property and examine witnesses in public hearings.

### Rigid Penalty for Perjury.

It provides a rigid penalty for perjury in the case, and specifically provides that no official or private person be called as a witness before the examiners shall be excused from testimony, either because such testimony would incriminate him or because he learned facts as a private counselor or public official.

While Mr. Johnson and several of his colleagues were preparing to set the machinery for this inquiry in motion to-day, the

atmosphere around the Capitol was tense, and it was no less exciting at the Municipal Building. It was reported that Commissioner Judson, after signing the order of removal, was informed by one of his associates, Commissioner Cuno Rudolph, that he declined to affix his signature to the order. Mr. Judson was therefore compelled to seek Commissioner John A. Johnston in order that a majority of the Commissioners might sign the order, making it valid. Superintendent Ingham is a nephew of Senator Gallagher, of New Hampshire, chairman of the District committee of the Senate.

It is understood that one of the insurance companies is accused of buying a building in Washington, and a few days later having this property appraised for $500,000 more than the purchase price. This inflated value, it is charged, was put into the insurance company as a "surplus" and shares sold upon its guaranty. The names of prominent men were sought and used upon the letter heads, and alluring stock offers sent out by mail. The success resulting from this campaign was said to be so great that, it is charged, the price of the stock was doubled.

### Johnson in Quiet Probe.

Early in the summer, the Painesville (Kentucky) man wrote Mr. Johnson asking the Congressman's advice about the company, and asking for a recommendation concerning an investment in its stock. After an inquiry, Mr. Johnson replied, advising against such an investment, and since that time has been quietly gathering information about the company.

A few days ago a prominent Washington financier, who has been seeking from President-elect Wilson the appointment of inaugural chairman, resigned from connection with the company; and another financier, who has been equally active in making a campaign for appointment as inaugural chairman, is said to have been one of the original promoters of the venture. All these facts can be proved, according to Mr. Johnson, and the letter heads of the company bear names prominent in congressional judicial, and financial affairs of the District.

Plaintiff offered testimony tending to show publication of the foregoing in the Baltimore Sun of December 14, 1912, and that the circulation of the paper on that day was 86,776; that the defendant had an office in the city of Washington from which orders could be had at the Sun Bureau on Fourteenth street; that plaintiff was superintendent of insurance of the District of Columbia; that he knew many people in the city of Washington and the city of Baltimore; that the Commissioner referred to in the above article was Colonel William V. Judson, Engineer Commissioner; that the Municipal Building was the District building where the Commissioners have their offices, and where the office of plaintiff as superintendent of insurance is located; that the Cuno H. Rudolph referred to is the president of the Board of Commissioners. John A. Johnston was the other civilian Commissioner. That there is no Senator Gallagher of New Hampshire, but the article meant Senator Gallinger; that he is not a nephew of Senator Gallinger, but a distant relative; that the Congressman Johnson referred to is Representative Ben Johnson, Chairman of the District committee of the House of Representatives. That plaintiff on his way to his office on December 14, 1912, had his attention called by several persons to the article in the Baltimore Sun, and bought a copy at the first news stand; that it was a great shock when he was told of and saw the article; that plaintiff had never been removed or suspended from office.

J. Fred Essary, called by defendant, said he had been correspondent of the Baltimore Sun about three years. While in the press gallery of the House of Representatives he heard the resolution offered by Representative Johnson. This resolution was then read. It contained a recital of a resolution committing to the District committee the investigation of the conduct, management, and affairs of certain fire insurance companies, certain individuals, and to examine the papers, etc., of the superintendent of insurance of the District of Columbia. That after reading the resolution witness made notes of it with the idea of writing an article upon it. That about 7 o'clock that day, Arthur B. Crock, of the Courier Journal, came to witness's

office and told him he had written a story bearing on the investigation, and would relieve him of the trouble of writing it. Crock did this under what is known in Washington as a sort of co-operative arrangement whereby newspaper men work together, it being impossible for one or two men to report all of the business of Washington in a day. Witness read the story and it was printed in next morning's Sun just as Crock wrote it. Witness did not accept the story, however, without making particular inquiry as to the source of Mr. Crock's information. He had no reason to question its accuracy, as he had co-operated with Crock for two or three years and found him to be an intelligent and conscientious newspaper man. Knowing the fact of the investigation, witness asked Crock where his information came from. Crock replied that he had gotten it from Representative Johnson, of Kentucky; he had told him the District Commissioners had suspended Ingham pending the investigation. Witness further read an article communicated by him to the Sun, January 26, 1913, relating to this investigation, and giving an account of the examination of a Washington judge. About the middle of this article appears the following sub-headline:

"Tends to Vindicate Ingham.

"At the time the report was current that District Insurance Commissioner Ingham had been suspended. This proved later to be untrue, and the more recent developments in the inquiry have tended strongly to vindicate Mr. Ingham.

"He was made a target of, it is now believed, for the reason that he was connected with the family of Senator Gallinger, chairman of the District committee of the Senate."

Witness testified further that at the time he wrote the article of January 26 he had had no complaint from plaintiff or from any source of the article of December 14; that it came to his notice some time after the first article was written; that there was an error in it inasmuch as plaintiff had not been removed pending the investigation, but in the rush of business he had

given no attention to the matter until the investigation had proceeded some two or three weeks. He followed the testimony in the case from the Washington papers, and at the first opportunity wrote his second article with the view of setting right the former error, if one had been committed; felt the impulse to right the injury that had been done plaintiff whether complained of or not.

Defendant read a letter from plaintiff's counsel to C. H. Grasty, president and general manager of the defendant corporation, dated March 3, 1913, in which he called attention to the article announcing the dismissal of plaintiff, and of his employment by plaintiff to bring action for the libel, and inquiring if he desired to make amends or compensation without litigation.

A reply to this letter was read, dated March 5, 1913, which said: "If we have done an injustice to Mr. Ingham, as stated in your letter, we shall make thorough correction regardless of whether you bring a suit or not. Any such errors in the Sun are made in the effort to print the news, and when we make them it is our settled practice to correct them promptly, frankly, and without reserve, and with the view of making the fullest reparation possible."

Plaintiff then read the following letter from Grasty to the correspondent Essary:

March 5, 1913.

My Dear Mr. Essary:—

I send you, herewith, copy of letter from Mr. Easby-Smith, together with my reply thereto.

Please immediately proceed to investigate this matter, and if the facts are as stated by Mr. Easby-Smith, I want to set his client right, thoroughly and promptly and without any regard to the question of libel suit. Kindly let me hear from you at once in this matter, and if we are in error give me full explanation.

Another letter from plaintiff's counsel to Grasty, dated March 31, 1913, was to the effect that he had been expecting to hear from him since Mr. West called a couple of weeks before, as to proposition for settlement, and saying that sufficient time had

been given, and that he would be compelled to file suit unless he heard from him within a few days.

Defendant offered in evidence an article which Essary testified was written by him and published in the Baltimore Sun next day, under the following headlines:

### Mr. Ingham Exonerated.

### Congressional Committee Repudiates all Charges Against Him. Effort to Oust Him Failed.

### Superintendent of Insurance in Washington is Fully Vindicated After Official Investigation.

(From the Sun Bureau.)

The article contained a statement of the facts about the attack on plaintiff; that the motion to suspend him by Commissioner Judson had failed, and the conclusions of the committee that there can be no serious criticism of plaintiff, and that the accusations should be promptly dismissed.

On cross-examination witness Essary testified that he asked Crock where he got his information about plaintiff, and was told that he got it from Representative Johnson; that he specially asked as to plaintiff's suspension, and was told that the Commissioners had suspended him; that the article did not state that plaintiff had been removed, but that the headline does so state. The responsibility for the headline rests in the city or news room in Baltimore. That he had nothing to do with the headline of the article, but that the article gives the impression which the headline states.

Charles H. Grasty, for defendant, was president and general manager for the defendant when this matter occurred. Did not know plaintiff, and had no knowledge of the publication until he received the letter from plaintiff's counsel. That he had no malice or ill-will against plaintiff. Defendant read in

evidence from the records of the District Commissioners a motion by Commissioner Judson that the office of superintendent of insurance be declared vacant. This motion was not carried. Also a letter from Grasty to H. West, of the Sun Bureau, in Washington, asking his advice about the letter from plaintiff's counsel.

West testified that he consulted with Essary, called on plaintiff's counsel and offered to make a correction, and was told that the time had gone by when a correction would be satisfactory. Witness submitted a form of correction to counsel, who said the time had gone by in which it would be satisfactory. Witness wrote a correction, which was published in the Baltimore Sun March 22, 1913. This article is as follows:

## Ingham Still in Office.

### Superintendent of Insurance Not Removed as Stated in the Sun.

The attention of the Sun has been called to the fact that in its issue of December 14, 1912, in a report of the recent congressional investigation of two insurance companies of the District of Columbia, it was stated that Superintendent of Insurance Ingham had been removed.

Superintendent Ingham was not removed or suspended during the investigation, and the Sun desires to express its regret that this error in its report should have occurred.

Defendant then read the report from the congressional committee toward exonerating the plaintiff.

Plaintiff asked an instruction to the effect that, in estimating the damages to be awarded the plaintiff, you should render a verdict for such sum as you believe from the evidence will fully and fairly compensate him for the injuries suffered by him by reason of the publication by the defendant of the libel complained of, including the mental pain, distress, and humiliation

which you may find he suffered as the result of the publication, and for the detraction from his good name and reputation which the publication of the defamatory article may have occasioned, or may hereafter occasion; and in this connection you may consider the extent of the circulation of the publication.

Defendant excepted to this instruction.

Plaintiff offered instruction number eight, which was given over the objection of the defendant, and exception reserved. It reads as follows:

"You are instructed that the publishers of newspapers are held by the law to the highest accountability for unreliable publications, and that it was the duty of the defendant as the publisher of a widely circulated newspaper to exercise reasonable caution against the false defamation of the innocent, and to take reasonable care to ascertain the truth of the defamatory matter affecting the character, good name, and reputation of the plaintiff; and if you believe from the evidence that the defendant failed to exercise such reasonable care, and that the libel complained of was published without taking reasonable precautions to ascertain the truth of the allegations concerning the plaintiff; and if you further find from the evidence that the libel complained of was published by the defendant with reckless indifference to the injuries which it might occasion to the plaintiff, then such failure to take reasonable precautions and such reckless indifference to the rights of the plaintiff is equivalent to an intentional violation of the plaintiff's rights, or to malice in fact, and sufficient to justify the jury in awarding the plaintiff punitive damages."

Defendant offered the following instruction, which was refused, and exception reserved. It reads as follows:

"The jury are instructed that if they find from the evidence that the defendant's correspondent Essary honestly and in good faith believed the statements in the newspaper article set forth in plaintiff's declaration to be true, and had the grounds for such belief sufficient to satisfy an ordinary prudent and

cautious man that such statements were true, then the plaintiff is not entitled to recover punitive damages in this case."

Defendant then offered the following instruction, which was refused, and exception reserved:

"The jury are instructed that if they find that the defendant's correspondent Essary was prompted by actual malice, or acted with reckless or careless indifference to the rights and feelings of the plaintiff in the publication of the newspaper article set forth in plaintiff's declaration, that such actual malice or reckless or careless indifference cannot be imputed to the defendant on the evidence in this case."

The court in the general charge stated to the jury as follows:

"You will consider all the circumstances of the case, and assess those damages at what you believe is a fair and just sum, merely with a view to compensating the plaintiff, so far as he can be compensated by money damages, as is stated in the instruction which has been read to you. Those are all the damages which a plaintiff is entitled to recover in his own right strictly as a matter of law, but in this class of cases, if the jury find certain other elements to be present, the jury has a right to award punitive damages. These damages are to be awarded, if at all, as a punishment to the defendant, and by way of an example to the defendant and to the community in the interest of law and order; and consequently they rest entirely in the discretion of the jury, not only as to the amount, but as to whether any shall be awarded at all. It is my duty to call your attention to the elements which would justify you, if you find them to exist in the case, in awarding such damages."

This was excepted to.

The jury returned a verdict for the plaintiff, assessing his damages by reason of the premises in the sum of $6,000; $5,000 of which they assess as compensatory damages, and $1,000 as punitive damages.

The court overruled a motion for a new trial and entered judgment upon the verdict for the whole amount, and defendant has appealed.

*Mr. Arthur Peter* and *Mr. Julian W. Whiting,* for the appellant, in their brief, cited, *Branch* v. *State,* 41 Tex. 622 ; Brickwood's Sackett Instructions, ¶ 197 ; *Bailey* v. *Holland,* 7 App. 184, 189 ; Bacon, Abr. title "Error," p. 383 ; *Denver & R. G. R. Co.* v. *Harriss,* 122 U. S. 610 ; *Detroit Post* v. *McArthur,* 16 Mich. 447 ; *Eviston* v. *Cramer,* 57 Wis. 571 ; *Phila., etc., Rd.* v. *Quigley,* 21 How. 202, 210 ; *Gambrill* v. *Schooley,* 93 Md. 48 ; *Haines* v. *Schultz,* 50 N. J. L. p. 484 ; *Hagan* v. *Railroad,* 3 R. I. 88 ; 1 Joyce, Damages, §§ 122, 135–137 ; *Lake Shore, etc., R. Co.* v. *Prentice,* 147 U. S. 101 ; *North Carolina* v. *Vanderford,* 35 Fed. 282 ; *Northern C. R. Co.* v. *Newman,* 98 Md. 507 ; *Pierce* v. *United States,* 37 App. D. C. 582 ; *Russell* v. *Washington Post,* 31 App. D. C. 277, 281 ; 1 Sedgw. Damages, 9th ed., §§ 363, 368, 380 ; *Steamboat Co.* v. *Davis,* 12 App. D. C. 323 ; *The Amiable Nancy,* 3 Wheat. 546 ; *Wilkes* v. *Wood,* 19 How. St. Tr. p. 1153 ; *Washington Herald Co.* v. *Berry,* 41 App. D. C. 322, 340 ; *Woodward* v. *Ragland,* 5 App. D. C. 220 ; *Washington Times* v. *Downey,* 26 App. D. C. 262.

*Mr. James S. Easby-Smith* and *Mr. Ralph B. Fleharty,* for the appellee, in their brief, cited *Billings* v. *Field,* 36 App. D. C. 16 ; *Chaloner* v. *Washington Post Co.* 36 App. D. C. 231 ; *Denver etc., R. Co.* v. *Harris,* 122 U. S. 610 ; *Gambrill* v. *Schooley,* 93 Md. 48 ; *Re Gompers,* 40 App. D. C. 293 ; *Lake Shore, etc., R. Co.* v. *Prentice,* 147 U. S. 101 ; *Northern C. R. Co.* v. *Newman,* 98 Md. 507 ; *Pierce* v. *United States,* 37 App. D. C. 582 ; *Ross* v. *Fickling,* 11 App. D. C. 442 ; *Russell* v. *Wash. Post Co.* 31 App. D. C. 278 ; *Wash. Herald Co.* v. *Berry,* 41 App. D. C. 322 ; *Wash. Time Co.* v. *Downey,* 26 App. D. C. 258 ; D. C. Code § 226.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

It is not seriously contended that the charge of the court permitting the jury to find compensatory damages was error. The

facts alleged in the article as regards the removal of plaintiff were libelous *per se.* It tended to bring him into contempt and disgrace. *Norfolk & W. S. B. Co.* v. *Davis,* 12 App. D. C. 306, 332.

In that case it was said: "Where, in an action for libel or slander, the cause of action is proved against the defendant, the jury are not limited to nominal damages merely, though no evidence is given on behalf of the plaintiff, and where the libel is actionable without the averment of special damages, the jury may take into consideration not only the injury that has arisen, but that which may thereafter arise, from the publication of the libel." See also *Washington Herald Co.* v. *Berry,* 41 App. D. C. 322, 339.

The serious contention is as to the instruction permitting the jury to find punitive damages also. Essary was a correspondent of the Baltimore Sun. His duties were to collect and forward news items. It does not appear that the corporation or its manager knew of the character of the article or of anything to refute the act of publication. On the contrary, the paper published the refutation of the story and sent a representative to the plaintiff with an offer to publish a correction, and this correction was also published. *Lake Shore & M. S. R. Co.* v. *Prentice,* 147 U. S. 101, 107, 37 L. ed. 97, 101, 13 Sup. Ct. Rep. 261, where the court said: "Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offense. A principal, therefore, though, of course, liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive, or malicious intent on the part of the agent." See also *Haines* v. *Schultz,* 50 N. J. L. 481, 14 Atl. 488; *Detroit Daily Post Co.* v. *McArthur,* 16 Mich. 447; *Eviston* v. *Cramer,* 57 Wis. 570, 15 N. W. 760; *Norfolk & W. S. B. Co.* v. *Davis,* 12 App. D. C. 306, 329; *Washington Gaslight Co.* v. *Lansden,* 172 U. S. 534, 43 L. ed. 543, 19 Sup. Ct. Rep. 296.

It was therefore error to submit the question of punitive damages to the jury.

The verdict for punitive damages being separate and distinct from that for compensatory damages, if the plaintiff shall, within ten days from this date, remit the amount of that verdict, $1,000, the judgment will be modified to that extent and affirmed, each party paying his own costs in this court.

If the amount be not remitted as above provided, the judgment will be reversed with costs, and the cause remanded for a new trial.

A remittitur was filed, and the judgment was modified and affirmed.                    *Modified and affirmed.*