**WASHINGTON ANNAPOLIS HOTEL CO.**
**v. RIDDLE.**
No. 9225.

United States Court of Appeals
District of Columbia.

Submitted December 1, 1947.

Decided June 1, 1948.

Mr. Richard W. Galiher submitted on the brief for appellant.

Mr. James J. Laughlin submitted on the brief for appellee.

Before STEPHENS, CLARK and WIL-BUR K. MILLER, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a judgment for slander. The plaintiff below, Maude Virginia Riddle (appellee) charged in her complaint that the defendant, Washington Annapolis Hotel Company (appellant), by its

agent, one Hills, in the presence of others, accused her of a crime and thereby damaged her reputation, caused her pain and mental anguish and impeded her efforts to obtain employment. The defendant denied the charge.

The plaintiff testified that on Saturday, December 25, 1943, she was in the employment of the defendant hotel company as a cashier and assistant auditor and was then on night service. A part of her duty on completing her shift was to enclose in an envelope and deposit in a slot in a safe in the auditor's office the money she had received from hotel guests. During the night of December 25-6, she took in $151 and some cents, and on going off duty at seven o'clock Sunday morning, December 26, she placed in the slot the envelope containing this sum. She reported for duty on Sunday night but was excused for illness. Pearl Jones, another assistant auditor, testified that on Monday, December 27, she inquired of the plaintiff by telephone at her residence as to what she had done with the "turn-in" for Saturday. The auditor's office had been closed on Sunday and apparently the loss of the envelope was not discovered until Monday. The plaintiff replied, according to Miss Jones, that she had put the envelope in the slot, as usual. Hills testified that he was assistant to the general manager in the special investigator detail of the hotel chain of which the defendant is a member and that on the night of December 25-6 he was working on relief for the regular house detective; that on Monday evening he called the plaintiff by telephone at her residence and asked and received permission to come to see her there. According to the plaintiff, when Hills arrived there were present, in addition to the plaintiff herself, a friend, named Mrs. Adams, and her son, six years of age. Hills, so the plaintiff testified, said: "Miss Riddle, if you will tell me what you done with the rest of that money, we won't prosecute."[1]

The plaintiff replied, "you can prosecute or do anything you want, but I don't have the money." Hills denied making this statement; he testified that on admission to the plaintiff's residence he assured her that "we in no way suspected her of stealing, but we wanted to find out if possible what happened to it. . . . She told me she was sure she put the envelope in the safe but I questioned her, and she said she wasn't sure. She said she put it on a desk; another time she said she put it on the table." According to the plaintiff, Hills requested her to accompany him to the hotel to help find the money and she assented. On the way they passed a bar and Hills asked her to go in and "have some drinks before we go up to the hotel." This invitation she declined. Hills denied extending the invitation. Hills testified also that he had "Not a bit" of ill will or malice toward the plaintiff and no disagreement with her; that the hotel manager had called his attention to the fact that the envelope was missing and asked him to see if he "could get any clue to what happened to it"; that his conversation with the plaintiff was friendly. Further, according to Hills, he found during his investigation that the plaintiff had left her envelope once before on a table and that on that occasion her relief cashier had picked it up and put it in the safe. Hills said that on the occasion in question in the instant case, someone around the office might have taken the envelope since six or seven persons had access to the office; that all of the persons in the auditor's office had access "to this box where this money was contained." He testified further that he questioned everyone who was around there, some six or seven, including the clerk and the telephone operator, and the man who cleaned up—all who might have had access to the room where the plaintiff worked. In investigating the case Hills, according to his testimony, did not visit the homes of employees other than the plaintiff or call

[1] The reference to the "rest of that money" was apparently occasioned by the fact, shown by the evidence, that the plaintiff had in accordance with the hotel practice, received, when she went on duty Sunday night, from the cashier who preceded her, $3,000 kept on hand to be used for making change and cashing checks. It is not in dispute that the plaintiff turned this amount over to the cashier following her on shift Sunday morning.

them on the telephone since "they were all right there in the hotel." The missing envelope was not found.

The plaintiff testified that on Tuesday, December 28, "I called and told them that I was able to come in to work, and they said, 'You don't need to come in; you are fired.' . . . I asked them what I was fired for, and they said, 'Stealing.'" According to Romello, the hotel auditor, the plaintiff "called up and stated that she would be to work that night. I said I had made arrangements to cover her, because she had been sick, and I didn't know whether she would come in or not. I said, 'No, you are not coming in tonight.' Then, she said, 'I want you to tell me that I am fired.' I said, 'Well, consider yourself fired.'" "Q Was there anything said then and there as the reason why she was fired? A No, sir. Q Did you ever accuse her of stealing the money? A Never did, sir; never thought of it."

The plaintiff filed the instant suit on December 31, 1943. On January 29, 1944, according to the plaintiff's testimony, her counsel asked the defendant in writing for a release so that she could get employment elsewhere, but the release was refused. Romello, however, testified that he did not give the plaintiff a release for the reason that she never asked for one. He admitted that he knew that at that time she could not get employment elsewhere without a release.[2]

At the close of the evidence the defendant requested the court to instruct the jury that the plaintiff had failed to prove a cause of action and that the verdict should therefore be for the defendant. This request was upon the ground that the words used by Hills as testified to by the plaintiff were not slanderous, and that even if slanderous they were qualifiedly privileged with a consequent burden upon the plaintiff to show actual malice, and that there was no evidence of such malice. The defendant also requested the court to instruct the jury that the charge of "theft" testified to by the plaintiff was qualifiedly priv-

ileged and that the plaintiff to recover must prove actual malice. These requests were denied upon the ground that, there having been a denial by the defendant of the uttering of the words testified to by the plaintiff, the defense of qualified privilege could not be relied upon; that there was no evidence of a basis for the charge of "theft" if made, and no evidence of a complete investigation by the defendant of the loss of the envelope; and that under these circumstances the defense of qualified privilege could not be relied upon. The court at the plaintiff's request and over the defendant's objection instructed the jury that if they believed from the evidence that Hills, the defendant's agent, accused the plaintiff of "stealing" they must find for the plaintiff; and that if they found that in making the accusation the defendant was moved by actual malice, they might return a verdict for punitive as well as compensatory damages.

The defendant objected to the admission of the evidence to the effect that Hills invited the plaintiff to have some drinks. The objection was overruled. The defendant moved to strike from the record the evidence to the effect that the plaintiff was discharged for stealing and that the plaintiff was refused a release. This motion was denied.

During his argument to the jury, plaintiff's counsel said:

Now, members of the jury, I do not intend to talk to you any longer about a situation of this kind. Of course, a poor person always suffers. Do you suppose this hotel would have done that to a rich person's daughter or a rich person's son? Of course they would not. The poor must suffer always in a situation of this kind.

*       *       *

Of course, Mr. Quinn would have you believe, because he represents a wealthy client, a big hotel, a corporation, that they are as pure as driven snow.

The defendant moved for a mistrial on account of these remarks. The motion was denied.

There was a verdict for the plaintiff in the sum of $500. Motion for a new trial

[2] It appears not to be in dispute in the case that under "manpower controls" then in force release from given employment was necessary in order to get other employment through the United States Employment Service.

736

was denied and judgment was entered on the verdict. This appeal was then taken.

The defendant attacks the correctness of the foregoing rulings. We shall state and answer seriatim the questions thus presented.

**1.** Were the words used by Hills, as testified to by the plaintiff, i. e., "if you will tell me what you done with the rest of that money, we won't prosecute," slanderous? The answer to this question is in the affirmative. The words clearly imputed a crime. Such an imputation is defamatory. Pollard v. Lyon, 1875, 91 U.S. 225, 23 L. Ed. 308; Friedlander v. Rapley, 1912, 38 App.D.C. 208.

**2.** Assuming that the defense of qualified privilege was otherwise available to the defendant, was it made unavailable by the defendant's denial of the allegations of the plaintiff's complaint concerning the utterance of the slanderous words? The answer to this question is in the negative. Privilege may be availed of under a general denial. Ashford v. Evening Star Newspaper Co., 1914, 41 App.D.C. 395. Moreover, the issue as to privilege was tried by implied consent of the parties. Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A., provides that "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. . . ." It is true that denial of utterance of the slanderous words and reliance upon the defense of qualified privilege are inconsistent, but Rule 8(e) (2), Federal Rules of Civil Procedure, permits inconsistent defenses.[3]

**3.** Assuming that the defense of qualified privilege was otherwise available to the defendant, was there lacking in the plaintiff's case evidence of actual malice? The answer in view of all the circumstances in the case is in the negative so far as the defendant's agents Romello and Hills

are concerned. In the testimony of the plaintiff that she was told by the defendant's auditor Romello that she was "fired for stealing," in her testimony as to the accusatory language used by Hills, and in her testimony that a release from employment was refused her by Romello, there is evidence from which an inference of actual malice in the persons named might reasonably, although not necessarily, be drawn. The nature of the defamatory language itself may constitute evidence of actual malice. White v. Nicholls, U.S.1845, 3 How. 266, 11 L.Ed. 591; National Disabled Soldiers' League v. Haan, 1925, 55 App.D.C. 243, 4 F.2d 436; Ashford v. Evening Star Newspaper Co., supra; Fahr v. Hayes, 1888, 50 N.J.L. 275, 13 A. 261.

**4.** Assuming that the defense of qualified privilege was otherwise available to the defendant, was there in an absence of any basis for the accusation of crime against the plaintiff, such conclusive evidence of actual malice as warranted the trial court in refusing to submit the defense of qualified privilege to the jury? The answer is in the negative. It is without dispute that the envelope was in the plaintiff's custody on the night of December 25-6 and that it was not found thereafter; and the plaintiff's explanation as to the loss of the envelope was vague. It, therefore, cannot be said that there was a total lack of evidence pointing to possible culpability on the plaintiff's part.

**5.** Assuming that the defense of qualified privilege was otherwise available to the defendant, was it made unavailable by a lack of evidence of a complete investigation of the loss of the envelope? The answer to this question is in the negative. As shown in the foregoing résumé of the testimony, there was evidence of a full investigation. Moreover, no authority is referred to and we know of none requiring a full investigation as a foundation for the

[3] Rule 8 (e) (2) provides: "A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both. . . ."

assertion of a qualified privilege to communicate a charge of crime.

■ 6. Was the court nevertheless justified in declining to instruct the jury that the charge of "theft" testified to by the plaintiff was qualifiedly privileged and that the plaintiff to recover must prove actual malice? The answer to this question is in the affirmative. An understanding of this answer requires a brief résumé of the law of defamation and the basis of privilege. As said in Atwater v. Morning News Co., 1896, 67 Conn. 504, 34 A. 865:

. . . The two main elements [in a right of action for defamation] are injury to the plaintiff and a wrongful act; i. e. an act in violation of a legal duty by the defendant. The first element involves the definition of a defamatory publication; the second, of the duties imposed by law in respect to such publications. These duties are well settled. They are restrictive and permissive,—the general duty which binds every one to absolutely refrain from the publication of defamatory matter unless he possesses evidence of its truth so certain that he can successfully establish his charge in a court of justice; and the special duty to communicate such matter in good faith upon any subject in which one has an interest, or has, or honestly believes he has, a duty (including certain moral and social duties) to a person having a corresponding interest or duty. An act by which another must be injured, intentionally done, in violation of legal duty, is, in law, maliciously done; and so it is held that the wrongful act of the defendant essential to actionable libel must be malicious, and this essential element of libel is briefly expressed in the rule, "Malice is the gist of the action of libel." Where the action is contested in respect to a defamatory publication, as a violation of the general duty only, malice is proved by a legal presumption established by the fact of publication. Where it is contested in respect to a violation of the special duty, malice must be proved by other evidence. But in either case the malice must be proved by the plaintiff, and in either case the malice consists in an intentional defamatory publication, in violation of a legal duty. The claim of "privileged communications," therefore, is not a special defense, but a practical traverse of the plaintiff's allegations, and must be established by evidence overcoming the proof the plaintiff is obliged to furnish, in every case, of the defendant's intention to mar his reputation in violation of legal duty. [67 Conn. at page 511, 34 A. at page 866]

It is to be emphasized, moreover, that communication of defamatory words to the person defamed alone is not actionable in tort for defamation. This is because the interest protected by the law of defamation is that in reputation and it is therefore essential to liability for either libel or slander that the defamation be communicated to some one other than the person defamed. United Cigar Stores Co. v. Young, 1911, 36 App.D.C. 390; Campbell v. Willmark Service System, 3 Cir., 1941, 123 F.2d 204; Royston v. Vander Linden, 1924, 197 Iowa 536, 197 N.W. 435; Shefill v. Van Deusen, 1859, 13 Gray, Mass. 304, 74 Am.Dec. 632; Prosser, Torts 810 (1941); Note, 24 A.L.R. 237 (1923). It follows that, while qualified privilege to make a defamatory communication is a privilege against the person defamed, the privilege arises not out of any relationship of duty or interest toward the person defamed but out of a duty or interest to communicate such matter to a third person having a corresponding interest or duty to receive the communication. This distinction is recognized in Williams v. Kroger Grocery & Baking Co., 1940, 337 Pa. 17, 10 A.2d 8. There one plaintiff, Wells, was employed by the defendant, Kroger Grocery & Baking Co., at its warehouse. Another plaintiff, Williams, hauled the defendant's rubbish under contract. The defendant's warehouse superintendent, Lindsay, accused Wells in the presence of one Booker, an employee of Williams, of having stolen butter from the warehouse and at the same time accused Williams of having received the stolen butter. On this state of facts in an action for slander brought by both Williams and Wells there was a verdict for the plaintiffs in the Court of Common Pleas. But thereafter, notwithstanding the verdict, the court en banc determined that Lindsay had acted under the protection of a "defeasible immunity"[4] which had not been avoided by the plaintiffs. The Superior Court found, however, that the defendant had not established a defeasible immunity, and on appeal to the Pennsylvania Supreme Court this ruling was affirmed. That court said:

. The principle upon which the doctrine of defeasible immunity rests is that the public interest and the advantage of freedom of pub-

[4] This is apparently the term used in the Pennsylvania practice for what is elsewhere described as qualified privilege.

lication, in each particular class of cases thus protected, outweigh the occasional private and personal damage thereby caused. It is deemed in certain classes of cases more advantageous for the community at large that particular individuals should occasionally be damaged with impunity, than that men under the exceptional circumstances should not be at liberty to speak and publish what they reasonably believe to be true, although it may be defamatory of the character of individuals. Or as it is expressed in some cases, "A statement made in good faith relating to a subject in which the person making the communication is interested or in regard to which he has a social or moral duty, when made to one having a like interest or duty, is privileged * * *". Nagle v. Nagle, 316 Pa. 507, 512, 175 A. 487, 489; Echard v. Morton, 26 Pa.Super. 579, 582; Restatement of the Law of Torts, Vol. 3, sec. 595 (1).

In view of the established law as outlined above, an analysis of the facts of the instant case clearly shows that there was no defeasible immunity involved here. It is obvious that if Lindsay had made his remarks to the person alone whom he accused, there would not have been a slander, since no other person would have been present to hear and to comprehend them. Restatement of the Law of Torts, Vol. 3, sec. 577; Harper, Law of Torts (1933), sec. 236, at p. 500; see Donnelly v. Publishers of the Public Ledger, 2 Phila. 57, 58. Therefore, in determining whether the circumstances gave rise to a defeasible immunity, our inquiry should be directed to ascertaining the relationship between Lindsay and Booker. Lindsay clearly had a social and moral interest in the subject of the remarks. But did Booker? Patently he did not. Booker had no legitimate interest in being told Lindsay's suspicions, nor was there any necessity whatsoever for Lindsay to make the statement in front of Booker. [337 Pa. at page 19, 10 A.2d at page 9]

For a similar ruling see Pullman v. Hill & Co., 1 Q.B. 524 (1890). See also RESTATEMENT, TORTS § 604, comment *c* (1938), referred to below in another context. It follows that in the instant case there was no basis for an instruction that the charge of "theft" was qualifiedly privileged since there was no showing of any interest or duty in Hills, acting for the defendant corporation, to communicate the charge to Mrs. Adams and her son and no interest or duty on the part of either of them to receive such a communication.

The cases relied upon by the defendant herein to support its contention that the defense of qualified privilege was available to it under the evidence and that there should therefore have been an instruction upon it, fail to recognize the distinction above discussed and misapply the doctrine of qualified privilege. For example, in Montgomery Ward & Co. v. Watson, 4 Cir., 1932, 55 F.2d 184, one of two plaintiffs, Mrs. Watson, an employee of the defendant Montgomery Ward & Co., was charged by its store manager in the presence of an assistant office manager and an elevator boy with having sold three articles for the price of one to her brother-in-law, Jamison, the other plaintiff. The Circuit Court of Appeals held that although the charge was defamatory, the defendant was exonerated under the doctrine of qualified privilege. Obviously, the doctrine was inapplicable, there being no duty or interest on the part of the manager to communicate the defamatory charge to the assistant office manager or elevator boy and no corresponding interest or duty on their part to receive it. Again in Kroger Grocery & Baking Co. v. Yount, 8 Cir., 1933, 66 F.2d 700, 92 A.L.R. 1166, the manager of the defendant Kroger Grocery & Baking Co. charged the plaintiff, Yount, a customer, in the presence of other customers and of employees, with having failed to pay the checker for an article which the manager had reasonable grounds to believe had been sent out by the plaintiff through the store turnstile to the plaintiff's son. Again the defendant was exonerated under the doctrine of qualified privilege. Here also the doctrine was misapplied, since there was no duty or interest on the part of the manager to communicate the defamatory charge to the other customers and employees and none on their part to receive the communication. See in addition Bavington v. Robinson, 1914, 124 Md. 85, 91 A. 777, also cited by the defendant, for a third instance of misapplication of the doctrine. We discuss below a different defense which might have been available to the defendant in Kroger Grocery & Baking Co. v. Yount.

7. Was it proper for the court to give the limited instruction that if the jury believed that Hills, the defendant's agent, accused the plaintiff of "stealing," they must find for the plaintiff? The answer to this question is in the negative. The instruction was apparently given under the court's theory that the doctrine of qualified privilege was not applicable. That

is was not applicable was, as we have above pointed out, correct. But the instruction was nevertheless erroneous in not calling to the attention of the jury other defenses available to the defendant in the circumstances of the case. Not only is it, as above pointed out, not actionable to communicate defamatory matter to the person defamed, but also in some circumstances there is a duty to do so—and if incidental to the performance of that duty it is reasonably necessary to make the communication in the presence of others, there will be no liability notwithstanding this publication. But in such a case the burden is upon the defendant to show that the publication was incidental and reasonably necessary to communicating the defamatory matter to the person defamed. See RESTATEMENT, TORTS § 604, comment *c* (1938). Thus in Kroger Grocery & Baking Co. v. Yount, above discussed, there was a duty upon the store manager to apprehend a suspected thief and if the duty was to be effectively performed it was necessary to make an accusation at the time and place in question notwithstanding the presence of employees and other customers. There are circumstances also in which an implied consent by a plaintiff to the publication of defamatory matter will exonerate a defendant. For example, in Brice v. Curtis, 1912, 38 App.D.C. 304, the plaintiff, an unmarried woman, who consulted the defendant, a doctor, for a diagnosis of symptoms, including cessation of menstruation, took her sister with her into the consulting room. The doctor announced in the presence of the sister a diagnosis of pregnancy. In an action for defamation the doctor was exonerated upon the theory of qualified privilege. But since there was no duty or interest on the part of the doctor to announce the diagnosis to the sister and none on her part to receive it, there was no privilege. The decision is supportable, however, upon the theory that the plaintiff, by bringing the sister into the consulting room, had impliedly consented that the diagnosis be announced in her presence. See also New York & Porto Rico S. S. Co. v. Garcia, 1 Cir., 1926, 16 F.2d 734, where again, under the evidence, there was no duty or interest to warrant publication of defamatory matter to persons other than the plaintiff, and therefore no basis for privilege, but where there was an implied consent to the publication.

■ In view of the foregoing the court in the instant case should have instructed the jury that if they believed from the evidence that Hills, the defendant's agent, accused the plaintiff of a crime they must find for the plaintiff unless they also found from the evidence that publication of the accusation to Mrs. Adams and her son was incidental and reasonably necessary to communicating it to the plaintiff herself, or unless they found from the evidence that by receiving Hills at her residence after advice by telephone that he desired to call, the plaintiff impliedly consented to a conversation in the presence of her guests concerning the lost envelope, which conversation might reasonably have resulted in an accusation of crime. And the court should have instructed the jury that the burden of proof in respect of these two defenses was upon the defendant.

■ 8. Was it proper for the court to give the instruction that if the jury found the defendant moved by actual malice in making the accusation they might return a verdict including punitive damages? The answer is in the negative. While, as we have pointed out above, there was evidence from which an inference of actual malice, in the defendant's agents Romello and Hills, might be drawn, the plaintiff's action for defamation is not against them but against the defendant Washington Annapolis Hotel Company, a corporation. There was no evidence tending to show that the defendant corporation as such actually authorized Hills to utter the slanderous words attributed to him or that it ratified the utterance of the same or that the defendant company, through its officers or directors had any malice against the plaintiff. In the absence of such evidence punitive damages for defamation cannot lawfully be assessed against it. Aetna Life Ins. Co. v. Brewer, 1926, 56 App.D.C. 283, 12 F.2d 818, 46 A.

L.R. 1499; A. S. Abell Co. v. Ingham, 1915, 43 App.D.C. 582. It was not shown that either Hills or Romello was either an officer or director of the defendant corporation.

9. Was it erroneous for the court to admit, over the objection of the defendant, the evidence to the effect that Hills invited the plaintiff to have some drinks? The answer is in the affirmative. This evidence was irrelevant to the issues in the case. But the error was harmless since the evidence could not have affected the verdict.

10. Was it proper for the court to deny the motion to strike the evidence to the effect that the plaintiff was discharged for "stealing" and that she was refused a release? The answer is in the negative. Such evidence should have been stricken. Apparently the court's theory in retaining this evidence in the record was that it was relevant to the issue of qualified privilege and to the question of punitive damages. But, as we have demonstrated, the defense of qualified privilege was not available to the defendant in the circumstances of the case. Therefore no showing by the plaintiff of actual malice was necessary to defeat it. And, as we have also demonstrated, the evidence of actual malice, if any, was of such malice in the defendant's agents Romello and Hills, not in the defendant corporation as such through its officers or directors, and therefore punitive damages could not be assessed against it. Accordingly the evidence in question was relevant to no issue in the case and should have been stricken.

11. Was it proper for the court to deny the defendant's motion to declare a mistrial on account of the remarks of the plaintiff's counsel in the course of argument to the jury as above described? The answer to this question is in the negative. By those remarks plaintiff's counsel was suggesting that the defendant should respond in damages because it was rich and the plaintiff poor, i. e., that justice should be administered unequally as between the rich and the poor. There was, moreover, no evidence as to the financial condition of the defendant hotel company. A mistrial should have been declared on account of these remarks. We are not obliged to determine whether an instruction to disregard them would have been sufficient to cure the effect of the misconduct of the plaintiff's counsel in making them, for no such instruction was given.

To the extent that the views herein expressed are contrary to the theory of the decision in Brice v. Curtis, supra, that decision is overruled.

The judgment is reversed and the cause remanded for further proceedings in accordance with this opinion.

Reversed and remanded.