**Hercules PINKNEY, Plaintiff,**

v.

**DISTRICT OF COLUMBIA et al., Defendants.**

**Civ. A. No. 75–2115.**

United States District Court, District of Columbia.

Oct. 18, 1977.

Peter R. Kolker and James G. Heldman, Perazich & Kolker, Washington, D. C., for plaintiff.

John A. Earnest and George T. Masson, Jr., Asst. Corp. Counsel for the District of Columbia, Washington, D. C., for defendants.

## OPINION

SIRICA, District Judge.

This is an action in which plaintiff, Hercules Pinkney, challenges his dismissal as an employee of Federal City College, a public institution operated by the District of Columbia. Named as defendants are the District of Columbia, Richard K. Fox, Chairman of the District of Columbia Board of Higher Education, and Dr. Wendell P. Russell, President of Federal City College. Each of the individual defendants is sued in his official as well as individual capacity. Pinkney claims that his termination by Federal City College was in breach of contract, in violation of governing regulations and the fifth amendment to the Constitution and that his dismissal for the reasons stated by the College constituted defamation of character. For relief, Pinkney seeks reinstatement, restoration of back pay, correction of his personnel records and damages for defamation. The matter is presently here having come on for hearing on cross-motions for summary judgment.

## I. *Background Facts*

The background facts involve a long series of events stretching from July 1970, when Pinkney entered into an employment agreement with Federal City College, through December 1975, when he brought suit. In bare-bones outline, a summary of the undisputed facts indicates that Pinkney was without interruption employed by Federal City as an untenured educator from July 13, 1970 until September 17, 1973, at which time he received a notice of proposed termination effective December 17, 1973.[1] The reason given for the dismissal was lack of funding for Pinkney's position. Pinkney was thereafter kept on at the College pending consideration by College officials that he be recommended for an alternative position. However, by letter dated February 1, 1974, Pinkney was informed that the College administration had decided not to recommend him for appointment to a different post and that his termination was final. Pinkney then appealed his dismissal due to insufficient funds to the District of Columbia Board of Higher Education and was successful in gaining reinstatement. Pinkney was so notified by letter dated April 15, 1974.

In the interim, however, Pinkney was indicted by a local grand jury on charges of conspiracy and false pretenses. This indictment led the College to renew its efforts to remove him. So on April 15, 1974, the same day, it should be pointed out, on which the College informed Pinkney that he was restored to his post as a result of his successful appeal, the College further informed Pinkney of a second proposal to remove him. This time the indictment provided the basis for removal. The letter of proposed termination provided that removal would not take place for 30 days and that Pinkney

had the right to challenge the action by furnishing the College with information concerning the criminal charges leveled against him. Pinkney immediately responded to the notice of proposed termination, objecting to the reason given for his removal and further objecting to the request that he provide information about the charges pending against him, before the matter came on for trial. The rationale for this objection was that requiring pretrial release of this information would compromise his fifth amendment right to refrain from compelled self-incrimination. In an effort to preserve his legal defense, and at the same time preserve his right to appeal his termination, Pinkney requested the College to defer considering his removal until after his trial was concluded.

This request, however, was denied. On April 29, 1974, the College informed Pinkney that his indictment warranted his dismissal and that his termination was effective May 3, 1974. Pinkney decided not to exercise his right to appeal the action immediately.[2] This decision was born of the fact that he did not wish to defend against the criminal charges then pending against him outside of the criminal forum. Also involved was the fact that Board Resolution 70–1, the regulation governing adverse actions taken against College employees, did not specify a time limit for noting appeals.[3]

Trial of the criminal charges against Pinkney, originally scheduled to start in May, did not begin until November 11, 1974 as a result of procedural delays and a continuance granted to the prosecution. On November 21, 1974, a mistrial was declared after the jury deadlocked at 11 to 1 for acquittal. Approximately one month later, the prosecution moved to dismiss the indictment against Pinkney, and the Court so

1. The suggestion was made at oral argument that plaintiff did not begin working at the College until several months after he executed his employment contract on July 13, 1970. This uncertainty however goes only to the date when employment actually began, and not, as would be relevant, to the contractual terms governing employment. Hence whether true or not it has no bearing on any of the material issues in dispute.

2. The right to appeal adverse personnel actions is one of the rights guaranteed employees under provisions of the District of Columbia Board of Higher Education Resolution No. 70–1 (1970) (hereafter cited as Board Resolution 70–1). See *id.* "" 2(c) & 5.

3. *Id.* " 5.

ordered. Pinkney then wrote the College requesting reinstatement given that the charges against him had been dismissed. But by letter dated April 2, 1975, the College informed Pinkney that his request was denied because of his earlier failure to provide information concerning his indictment and because he failed to appeal his termination in a timely fashion. This response prompted Pinkney to appeal to the Board of Higher Education. On June 10, 1975, the Board denied the appeal on the grounds that Pinkney had waited too long before appealing his dismissal. Pinkney then formally advised the District of Columbia that he intended to institute legal proceedings to contest his dismissal. This lawsuit followed.

Plaintiff challenges his dismissal as (a) a breach of contract, (b) as a violation of regulations governing dismissals, (c) as an infringement on his fifth amendment rights of due process and against compelled self-incrimination and (d) as amounting to defamation of character. Plaintiff seeks reinstatement with back pay, correction of his personnel files and damages for breach of contract and defamation.

## II. *Preliminary Considerations*

A. *Plaintiff's Claims are not Barred by the Notice Requirement of 12 D.C. Code § 309 in that the Obligation to Furnish Notice to the District of Columbia did not Accrue until after Plaintiff had Exhausted his Administrative Remedies and Plaintiff Thereafter Provided Prompt and Adequate Notice.*

Under 12 D.C. Code § 309,[4] suits to recover "unliquidated damages"[5] against the District of Columbia are barred unless the claimant first provides written notice to the Mayor of the District concerning the cir-

cumstances surrounding his claim. *Id.* Furthermore, he must do so "within six months after the injury or damage was sustained." *Id.* Both parties agree that compliance with 12 D.C. Code § 309 is a necessary prerequisite to maintaining the present suit insofar as an award of damages is sought. The parties disagree, however, as to whether the requirement was in fact satisfied. The sole issue here concerns timeliness, the adequacy of the notices sent by plaintiff being uncontested. Defendants contend that Pinkney failed to provide timely notice of his claims against the District of Columbia in that his claims accrued for purposes of § 309 on the date he was dismissed and in that he failed to furnish formal notice of these claims until approximately fifteen months later. Plaintiff opposes this argument, rightly in the Court's view, on the grounds that the notice requirement did not arise until after the ensuing administrative proceedings had fully run their course and that thereafter plaintiff furnished the District with prompt notice of his claims. In the Court's judgment, a proper regard for the purposes served by § 309 compels the conclusion that plaintiff properly waited until after the outcome of his administrative appeals before providing formal notice of his claims.

█ Section 309 distinguishes the District of Columbia from ordinary litigants and, apparently for reasons of economy, places the District at a litigative advantage by requiring potential claimants to put government officials on the early alert with regard to litigation likely to occur in the future. Ordinarily, notice of claims for unliquidated damages is governed by the longer statute of limitations. *See* 12 D.C. Code § 301. The concern embodied in § 309 is that District officials should be furnished

4. 12 D.C. Code § 309 provides:

 An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Commissioner of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or

damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

5. Plaintiff seeks an array of remedies including various injunctive orders and, as is necessary to trigger § 309, an award of damages. There is thus no doubt that § 309 is implicated in regards to some but not all of plaintiff's claims.

with notice of potential claims soon enough ahead of time to permit prompt investigation of the underlying facts. In this way the District will be in a position to settle deserving claims at the earliest possible time, at a savings to the taxpayer, and to obtain evidence necessary to defend competently against undeserving claims, also conserving taxpayer resources. H.R. Rep. No. 2010, 72d Cong. 2d Sess. 1, 2 (1933).[6]

█ Heedful of the purposes served by the provision, the courts have unhesitatingly applied § 309 to bar suits in instances where claimants failed to provide timely and adequate notice of their claims. In *Miller v. Spencer*, 330 A.2d 250 (D.C.App. 1974), for example, a suit to recover damages for personal injuries arising out of an automobile accident was barred on the grounds that plaintiff failed to furnish adequate notice of the claim within six months of the occurrence. Similarly, in *Hill v. District of Columbia*, 345 A.2d 867 (D.C.App. 1975), plaintiff sued for injuries sustained during a stay at a hospital operated by the District of Columbia. The suit was filed shortly after six months had run from the date of the incident and was barred for failure to meet the strict timeliness requirement imposed by § 309. These cases illustrate the general rule that the duty to provide notice under § 309 attaches as soon as plaintiff suffers actionable injury. This is so in the typical case because, once injury is sustained at the hands of municipal employees, plaintiff is immediately at liberty to take his claim to the courts. Nothing further needs to take place to render the claim ripe for judicial resolution.

█ The situation is different however where plaintiff, because of the nature of his claim, is obliged under the exhaustion doc-trine to present his grievance to appropriate authorities before bringing the matter to court. Where exhaustion is a necessary condition to bringing suit, plaintiff is under a duty to provide appropriate government administrators with the first opportunity to review and pass on his claim. Not until administrative processing is finally conducted is the matter ripe for judicial intervention. And thus not until then has the matter accrued for the purpose of triggering the duty to furnish timely notice of prospective litigation.

The suggestion is made that tolling the notice requirement until after administrative remedies are exhausted somehow offends the design of § 309 to put the government on the early alert with regard to litigation likely to take place. In fact, just the opposite is true. Where a claimant is required to pursue his administrative remedies under the exhaustion doctrine, he necessarily will alert the government to the existence of a potentially litigable dispute. Furthermore, he typically will provide government officials with a detailed explanation of his grievance inasmuch as administrative processing requires full disclosure of the facts and circumstances underlying the claim, and not, as is the case with § 309, bare notice of it. In this way prompt resort to the administrative process in no way offends the aims of § 309. Far from doing that, pursuit of administrative remedies generously serves the purposes behind § 309.

█ Defendants hasten to point out that Pinkney failed to timely pursue his administrative remedies by waiting until after the criminal charges against him were dismissed before appealing his removal to the College and Board. According to defendants, this delay was wholly unnecessary,

---

**6.** The legislative history behind § 309 affirms that the aims of the provision are to encourage prompt settlements and permit early investigation of potential claims while the facts are fresh. The Committee report accompanying the legislation described the design of the statute as assisting the District of Columbia "in the defense of the public interest where claims" are timely filed within the applicable "statute of limitations but so long after the event that it is impossible" for the city "to obtain evidence for use in litigation which may result." H.R. Rep. No. 2010, 72d Cong., 2d Sess. 1 (1933). Beyond this, Congress intended § 309 "to give the District officials reasonable notice of the accident so that the facts may be ascertained and, if possible, the claim adjusted." *Id.* at 2. *See generally*, 17 McQuillan, Municipal Corporations § 48.08 (3d ed. 1968); McCarthy, Local Government Law 285–86 (1975).

unfairly deprived the District of prompt notice of the underlying dispute and thereby prejudiced the government in later defending against the claim. A close look, however, at the facts in this case reveals that the delay occasioned by the ongoing criminal proceedings was excusable under the circumstances and by no means prejudiced the government. The undisputed facts indicate that from the very outset appropriate authorities of the District of Columbia government were alerted to the circumstances behind Pinkney's dispute with the city. By letter dated April 15, 1974, the College informed Pinkney of his proposed removal on the basis of his indictment.[7] A copy of this communication was sent to staff persons at the Office of the Corporation Counsel,[8] the very office of the District government, it should be noted, that is charged with the responsibility of investigating and then defending claims brought against the city and government agencies. This is also the office that receives and processes notices sent to the Mayor of the District under § 309. Pinkney responded to this letter the very next day, objecting to his termination as unlawful and unmistakably expressing an intent to challenge his dismissal administratively as soon as the criminal charges against him, then set for trial in May, were concluded.[9] A copy of Pinkney's letter was also sent to staff persons at the Office of the Corporation Counsel.[10]

Plaintiff took no further action until after the indictment against him was dismissed on December 18, 1974, after which date he promptly pursued his administrative remedies with authorities at the College,[11] and later with officials at the Board.[12] These efforts proved to be una-

vailing and Pinkney then furnished formal notice of his intention to take the case to court.[13] Throughout this period, the Corporation Counsel's Office remained actively involved in the matter to keep abreast of developments and to advise College and Board officials.[14]

Against this background, the suggestion that plaintiff engaged in needless and prejudicial delay appears plainly unfounded. Indeed, the delay that resulted was quite understandable given the pending criminal charges against plaintiff; and it was moreover kept to a minimum and did not prejudice the government by deterring legal staff from monitoring developments and playing an active role in the case. It would simply be at odds with the facts to conclude otherwise.

In the Court's view, then, there is no reasoned basis for barring plaintiff's claims on the grounds of untimeliness.[15]

*B. Defendants Fox and Russell are Not Liable to Plaintiff in Their Individual Capacity.*

The question of whether these defendants are individually liable to Pinkney turns on their participation—or lack of it—in the events leading up to the contested discharge. The undisputed facts reveal that neither defendant Fox nor defendant Russell was a factor in recommending to the College that Pinkney be dismissed on account of his indictment. Nor did either defendant take any part in reaching the final decision ordering Pinkney dismissed. Rather, the only connection between these defendants and plaintiff arose long after Pinkney was discharged. Following the

---

7. Plaintiff's Motion for Summary Judgment, Exhibit I (hereafter cited as Plaintiff's Exhibits).

8. *Id.*

9. Plaintiff's Exhibit J.

10. *Id.*

11. Plaintiff's Exhibit L.

12. Plaintiff's Exhibit O.

13. Plaintiff's Exhibits R and S.

14. Plaintiff's Exhibits M and N.

15. Defendants also assert that plaintiff's claims are barred by laches and failure to exhaust administrative remedies. A review of the relevant sequence of events however fails to hint at any basis that reasonably supports these objections.

dismissal of the criminal charges against him, Pinkney wrote defendant Russell, who, at the time, had recently assumed the presidency of Federal City College, seeking to reopen his case with a view towards reinstatement. In a letter dated April 21, 1975, Russell refused to grant Pinkney's request. Other than this, defendant Russell played no part in connection with Pinkney's termination.

■ Plaintiff apparently recognizes this, but argues nevertheless that Russell's refusal to order Pinkney reinstated is itself actionable. This argument however is untenable. The short answer to it is that it confuses the alleged wrong (the termination) with a refusal to grant the sought-after administrative remedy (reinstatement). In the Court's view, it is one thing to seek to impose personal liability on the individual who improperly brings about unlawful action, but it is quite another thing to attempt to impose liability on the person who has the power to correct the improper action but who, for reasons within his discretion, decides not to do so. The one *may* be actionable under the proper circumstances; [16] the other most assuredly *is not.*

■ The connection between defendant Fox and the wrong allegedly done to Pinkney is even more tenuous. Fox presently holds the position of Chairman of the D.C. Board of Higher Education. He is the successor to Flaxie M. Pinkett, who, on June 10, 1975, denied Pinkney's appeal from defendant Russell's decision denying plaintiff reinstatement. As such, he was not even in a position to commit an actionable wrong against plaintiff. Accordingly, if defendants Fox and Russell are at all liable to Pinkney in connection with his termination, it is not in their individual capacities and for damages, but rather in their official capacities and for prospective injunctive relief. This liability, however, depends upon resolution of Pinkney's claims, a discussion of which follows.

## III. *Plaintiff's Claims*

### A. *Plaintiff's Complaint Fails to State a Claim for Defamation of Character.*

Pinkney bottoms his claim for defamation on the ambiguous allegation that defendants somehow caused Pinkney's personnel record to reflect the fact that he was dismissed on account of his indictment. According to Pinkney, a defamation took place the moment an entry was made into his personnel file indicating the fact of his termination and the injurious reason underlying it. In the Court's view, however, this allegation is plainly insufficient.

■ To state a claim for defamation, plaintiff must allege that defendant published a statement injurious to plaintiff's reputation *to someone other than the plaintiff himself.* "This is because the interest protected by the law of defamation is that in reputation and it is therefore essential to liability for either libel or slander that the defamation be communicated to someone other than the person defamed." *Washington Annapolis Hotel Co. v. Riddle,* 83 U.S.App.D.C. 288, 293, 171 F.2d 732, 737 (1948). *See also Margoles v. Johns,* 157 U.S.App.D.C. 209, 214, 483 F.2d 1212, 1217 (1973). But the statement complained of here is not alleged to have been sent to anyone other than the plaintiff himself. Hence, no claim for defamation can lie. As was stated in *Church of Scientology of California v. Green,* 354 F.Supp. 800, 803 (E.D.N.Y.1973):

> Law in the field of defamation has changed considerably in a short span of time. However, an enunciation by Judge Cardozo in *Ostrowe v. Lee,* 256 N.Y. 36, 175 N.E. 505 (1931) is "as good as new":
>
>> In the law of defamation, "publication" is a term of art. . . . A defamatory writing is not published if it is read by no one but the one defamed. Published, it is, however, as soon as

---

16. See *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, *rehearing denied,* 361 U.S. 855, 80 S.Ct. 41, 4 L.Ed.2d 93 (1959) (officer immunity for acts committed within official discretion). *See also* 31 D.C.Code § 1602(c) (statutory immunity for official actions taken by members of the Board of Higher Education).

read by any one else. [citations omitted.]" (At p. 38, 175 N.E. at p. 505.)

 The suggestion is made that defendants wrongfully contributed to a chain of events that *threatened* the publication of Pinkney's dismissal for cause to prospective employers who might request and examine his personnel file when considering whether to employ him. But the threat of a defamatory publication, no matter how imminent it may be, is not itself actionable as defamation. Only if the threat is carried out is the protected interest in unimpugned reputation implicated. Nothing that appears of record here indicates that the College did anything more than retain the allegedly defamatory statement in its files. Thus, this claim must fail.

### B. *Breach of Contract.*

On June 13, 1970, Pinkney entered into an employment agreement with the District of Columbia Board of Higher Education by which he was appointed to a position of Associate Community Educator at the College.[17] This agreement was twice renewed with insignificant modifications and remained in effect on May 3, 1974, the date on which Pinkney was dismissed from his position because of the indictment lodged against him. Pinkney claims that the mere fact of his indictment did not constitute grounds for terminating him consistent with the terms of his employment agreement. This Court agrees.

The agreement between Pinkney and the Board dealt expressly with the subject of termination. Dismissal was explicitly permitted in the event of a "discontinuance of the work to be performed or because of a lack of appropriations or other funds" or for "misconduct in office, incompetency or willful neglect of duty."[18] Of these potential justifications, "misconduct in office" formed the exclusive basis on which the College proceeded in dismissing Pinkney. And in invoking this justification, the Col-

lege proceeded entirely on the basis of the indictment against Pinkney. As the notice of proposed termination plainly stated, the adverse action was taken for "the following reason: on January 22, 1974, you were indicted on job-related charges by the United States Grand Jury in Criminal Case No. 74–49."[19] The notice of actual termination similarly reflected that the reason for discharging Pinkney was the outstanding indictment against him: The College "ha[s] concluded after a careful review of all matters in the file in this case . . . that the reasons cited in [the notice of proposed termination, the charges] are sustained and warrant your removal."[20]

Defendants do not dispute that the action taken against Pinkney was based entirely on the indictment, nor could they give the plain and repeated expression of the reason underlying the dismissal. Yet they maintain that the action was nevertheless proper, ostensibly on the grounds that the indictment itself constituted "misconduct in office" sufficient to justify dismissal under the relevant provision of the employment agreement. This argument however is at odds with the plain meaning of the phrase "misconduct in office."

The question here is what did the parties intend when they agreed upon "misconduct in office" as a ground justifying termination of the employment agreement. This question is one of interpretation to be resolved on the basis of the unambiguous language used in the agreement. With this approach in mind, the Court has concluded that the College erred in invoking the "misconduct in office" provision solely because Pinkney was accused of criminal activity.

The Court has no doubt that the criminal offenses for which Pinkney was indicted were of the type that would warrant a finding of actionable misconduct if credible evidence supported the charges. Indeed, false pretenses and conspiracy go to the very fitness of individuals to hold a position

---

17. See note 1 *supra*.

18. Plaintiff's Exhibit A.

19. Plaintiff's Exhibit I.

20. Plaintiff's Exhibit K.

of trust. This is particularly so where, as here, the employing authority is a unit of government from which the public legitimately expects high standards of conduct on the part of public employees. This is also the case where, as in this case, the position held by the employee brought him into close and continuing contact with young persons enrolled at the College. Thus, these considerations rightly led College officials to consider invoking the "misconduct in office" clause when word reached them that Pinkney had been indicted. To have done nothing in the face of this accusation would have connoted a serious breach of public trust. But by the same token, an indictment is simply an *accusation* of misconduct, and not a *finding* of it. This is not to say that an indictment is a matter to be taken lightly by officials charged with making personnel decisions. On the contrary, it is a matter of serious consequence in assessing the fitness of an individual to continue in public employment and, depending on the nature of the offenses charged and the position of the indicted employee, it should spur the employing authority into investigating the background circumstances to determine whether actionable misconduct is supported by the facts. But an indictment is not an infallible indicator of wrongdoing. And it should not, absent an appropriate contractual or statutory provision, end the inquiry into whether an accused employee is fit to continue in his position by providing the sole grounds on which to base a *finding* of actionable misconduct.

■ According to defendants, the accusation of misconduct is itself sufficient evidence to warrant a finding of it consistent with the contract provision at issue in this case. But because this position undermines the ancient principle that an individual is presumed to be innocent until proven guilty, the Court cannot accept it. To be sure, the parties could have overthrown this fundamental concept in their contractual dealings by settling on some lesser standard to justify terminating their agreement. But for whatever reason they chose not to do so, choosing instead to express their intent through the unambiguous phrase "misconduct in office." In the Court's judgment, this language meant that termination of the agreement was justified only on a finding of wrongdoing, and not, as was the case here, simply on an accusation of it.[21]

## C. *Breach of Binding Regulations.*

■ The agreement reached between Pinkney and the Board of Education expressly incorporated regulations issued by the Board to govern adverse action taken against subject employees. These regulations, embodied in Board Resolution 70–1, basically set forth the procedures to be followed in demoting, suspending and removing Board employees. By incorporation into the contract, a breach of these regulations became actionable as a breach of the underlying contract.

■ Pinkney avers that his dismissal was in violation of Board Resolution 70–1 in that the notice of his proposed termination failed to contain a statement of "the reasons" that was "specifi[c] and in detail."[22] This Court however disagrees. A review of the notice sent to plaintiff reveals that the statement of reasons was indeed specific and detailed, so much so as to remove any doubt that Pinkney was fully informed of the reasons why he was being discharged. The notice specifically stated that the indictment against Pinkney provided the basis for his termination, enumerated the offenses with which Pinkney was charged and enclosed a copy of the indictment itself. That the reasons stated in the notice may

---

**21.** A different result might well have obtained if defendants had furnished anything to support the conclusion that plaintiff committed the crimes he was accused of and thus that the College was acting on evidence rather than mere suspicion in removing him. But inexplicably, defendants have failed to produce any-

thing to rebut plaintiff's showing that the College acted solely on the basis of the indictment. This issue therefore is no longer genuinely in dispute for purposes of plaintiff's motion for summary judgment.

**22.** Plaintiff's Exhibit B, ¶ 1(b).

not have been sufficient under the agreement to justify dismissal does not detract from the fact that they were stated "specifically and in detail."

### D. Due Process.

Pinkney makes the claim that his dismissal based on the indictment against him not only breached the terms of his employment agreement but also violated protections afforded him by the due process clause of the fifth amendment. This claim is directed at the substantive as opposed to procedural aspect of due process,[23] meaning that Pinkney is attacking the validity of the substantive rule under which the College acted in dismissing him rather than the procedures used to enforce that rule.[24] The precise rule being challenged is that criminal indictments against public employees are themselves legitimate grounds for taking adverse action against the individuals involved. Pinkney condemns this rule as setting up a fixed yet irrational presumption [25] that criminal accusations constitute reliable indicators that indicted employees are unfit to continue in public employment.

██ But plaintiff has no right to place this rule under due process scrutiny until after he has demonstrated that he possesses an interest afforded due process protection. Indeed, few principles have received more faithful adherence by the courts than the imperative of avoiding unnecessary due process adjudications. As recently stated in

Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), "the threshold question in any due process attack . . . whether the challenge is procedural or substantive, is whether there is a deprivation of life, liberty or property." Id., 431 U.S. at 544–545, 97 S.Ct. at 1959 (White, J., dissenting) (emphasis supplied).

Pinkney endeavors to invoke due process by asserting a protected property interest based on his expectation of remaining indefinitely in the College's employ.[26] In an effort to demonstrate this interest, Pinkney points to his employment history at the College. From July 13, 1970, when he was appointed to his post, until May 3, 1974, at which time the College discharged him, Pinkney held his position under a series of three written employment agreements. The first of these appointed Pinkney to his post for a two year term, the second renewed the appointment for an additional year and the third, from which the College dismissed him, extended the second agreement for yet another one-year period. Pinkney argues that this succession of agreements created in him a reasonable expectation of continued employment amounting to property protected by the due process clause. This Court however reaches just the opposite conclusion.

██ The controlling principles of law are set out in a line of recent Supreme Court decisions beginning with Board of

---

**23.** Moore v. City of East Cleveland, 431 U.S. 494, 544–551, 97 S.Ct. 1932, 1959·1961, 52 L.Ed. 531, 565–568 (1977).

**24.** Id.

**25.** See Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).

**26.** This interest in property, continued employment through successive renewals of his employment agreement, is the only interest advanced by plaintiff to invoke due process scrutiny. Compare Wieman v. Updigraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), cited in Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 560 (1972). For whatever reason plaintiff has chosen not to put forward a claim based on his liberty inter-

est in maintaining an unimpugned reputation in connection with the loss of a government benefit. See Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, rehearing denied, 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). This decision is likely traceable to the fact that plaintiff believed that his reputational interest would be adequately safeguarded by a common law claim for defamation. This belief however has proven to be mistaken as the Court has found plaintiff's claim plainly insufficient. Despite these developments, the interest in reputation is squarely raised in this case and, while it does not properly form the basis for an independent claim, the Court will consider it in relation to plaintiff's other claims. See Part IV infra.

*Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), continuing through *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), and culminating with *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). These cases establish that the existence of the requisite property interest is a question of local law [27] to be decided by examining relevant statutes, ordinances, administrative regulations, personnel guidelines and policies that bear on whether continued employment is assured by "rules or mutually explicit understandings" between the employee and employing authority. *Perry v. Sindermann, supra*, 408 U.S. at 601, 92 S.Ct. at 2699, 33 L.Ed.2d at 580.

■ Here plaintiff is at a loss to point to any rule or understanding that gives credence to the view that, because his employment agreement had been renewed twice before, it would have been renewed again had the College not acted to terminate it prematurely. To begin with, plaintiff enjoys the benefit of no statutory provision that guarantees indefinite future employment to employees working under contract with Federal City College. *Compare Arnett v. Kennedy, supra*, 416 U.S. at 140–41, 151–52, 94 S.Ct. at 1637–1638, 1642–1643, 40 L.Ed.2d at 25–26, 31–32.[28] Indeed, the relevant statute dealing with the employment conditions of the College personnel is notably silent regarding the tenure of faculty members,[29] except to leave the matter of tenure to the discretion of the Board to develop through appropriate rules.[30] To date, this discretion has gone unexercised, thereby settling the question.[31]

Equally, no administrative regulation touches on when a College employee can expect to remain employed for an indefinite term. *Compare Arnett v. Kennedy, supra*, 416 U.S. at 141–42, 94 S.Ct. at 1638, 40 L.Ed.2d at 26. Board Resolution 70–1 sheds no light on the question of entitlement to continued employment.[32] Titled "Procedure On Adverse Action," this regulation deals only with the procedures to be followed in cases of demotion, suspension and dismissal, the contents of notices to be sent to affected personnel and the methods by which administrative appeals are taken.[33] The suggestion that Board Resolution 70–1 somehow confers substantive guarantees of future employment simply misconceives the procedural bent of the regulation.

Nor does plaintiff make his claim of entitlement based on any informal institutional policy creating a system of implied tenure for College employees. *Compare Board of Regents v. Roth, supra*, 408 U.S. at 578 & n. 16, 92 S.Ct. at 2710 & n. 16, 33 L.Ed.2d at 561 & n. 16 *with Perry v. Sindermann, supra*, 408 U.S. at 601–603, 92 S.Ct. at 2699–2700, 33 L.Ed.2d at 580–81. That was the claim made in *Perry* where plaintiff "alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment." 408 U.S. at 602, 92 S.Ct. at 2700, 33 L.Ed.2d at 580. But plaintiff here makes a different claim, based not on the policies and practices of the institution, but rather on the bare-bones fact that he held his post for approximately four years under successively-renewed employment agree-

---

**27.** *Bishop v. Wood*, 426 U.S. 341, 344–45, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684, 690 (1976); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580 (1972).

**28.** At issue in *Arnett* was a federal statute that conferred indefinite appointments on civil service employees so long as their conduct conformed to reasonable limitations. Comparable statutory protection simply does not exist for employees, like plaintiff here, of the District of Columbia Board of Higher Education.

**29.** 31 D.C.Code § 1603(a)(4)A–F.

**30.** 31 D.C.Code § 1603(a)(4)(ii).

**31.** This situation with regards to College faculty is in sharp contrast to that of primary and secondary teachers. *Compare* 31 D.C.Code § 1521(a). These instructors are eligible for tenure after two years of satisfactory performance at their jobs. *Id.*

**32.** Plaintiff's Exhibit B.

**33.** *Id.*

**532**

ments. In the Court's estimation, this fact standing alone does not bring plaintiff within the holding in *Perry*. While *Perry* recognized that "A teacher, like the [plaintiff], who has held his position for a number of years, *might be able to show* from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure," to succeed he must connect the circumstances of his employment to institutional policy in a way that indicates that his situation qualifies him for "the equivalent of tenure" under the "unwritten 'common law' [of the] university." *Id.* (emphasis supplied). The necessary connection is not apparent in this case.

Thus it is seen that plaintiff enjoyed no expectancy whatsoever of keeping his position at the College beyond the date in 1974 when his appointment was set to expire. Failing that, he lacks the requisite property interest to trigger due process scrutiny and, for that reason, his due process claim must fail.

E. *The Privilege Against Compelled Self-Incrimination.*

The self-incrimination claim made in this case fairly arises out of these facts and circumstances. On April 15, 1974, the College sent Pinkney a written notice informing him that the College intended to discharge him on the grounds of his indictment. The notice further informed plaintiff of his right, guaranteed by provisions of Board Resolution 70–1, to contest the proposed action by furnishing the College with relevant information about the criminal charges lodged against him. Plaintiff replied the next day, disputing the adequacy of the reason given for the proposed action and, beyond this, "requesting that the College *not* entertain any proposal for [his] removal . . . until the conclusion of [the] trial"[34] because pretrial "release of such information . . . would violate the confidentiality of [his] legal defense" to

the criminal charges.[35] This request however was denied. By letter dated April 25, 1974, the College formally notified Pinkney that his dismissal was final and effective May 3, 1974.

Pinkney did not immediately exercise his right to appeal this decision to the District of Columbia Board of Higher Education. The ostensible reason for this inaction was again to avoid having to make pretrial disclosures concerning the pending criminal charges. Instead, he waited until after the criminal proceedings had fully run their course and resulted in a dismissal of the charges before petitioning the College and Board to entertain his case. But by this time, as a result of delays in bringing Pinkney's case to trial, including a continuance granted to the prosecutor, months had elapsed from the date on which Pinkney was dismissed and from the time that his employment agreement would have come up for renewal had the College not terminated it prematurely. This lapse of time led the College to reject as untimely Pinkney's request to reopen his case. In the words of the College, "the fact that you failed to supply any information relative to the job-related charges against you" and "your failure to exercise your appeal rights preclud[e] the College from acting on your request for reinstatement."[36] This response prompted Pinkney to seek relief from the Board. But it replied: "Although no time limit is set forth in Resolution 70–1 for filing an appeal, the [Personnel Committee of the Board] believes that the expiration of one year following your dismissal is too long a delay in filing an appeal. . . Your request is, therefore, denied."[37]

The question emerges from these facts whether the actions of the College and Board impermissibly burdened plaintiff in the exercise of his fifth amendment rights by confronting him with a Hobson's choice between self-incrimination and forfeiting his opportunity to contest his removal and,

34. Plaintiff's Exhibit J.

35. *Id.*

36. Plaintiff's Exhibit O.

37. Plaintiff's Exhibit Q.

through that, his livelihood as a public employee. Plaintiff contends that proper respect for the self-incrimination privilege required the College, in the first instance, to put off the dismissal proceedings against him until after the outcome of his criminal case, and further obligated the College and Board, once the criminal charges against plaintiff were dismissed, to reconsider the question of dismissal. Settled law on the issue counsels a different result, however.

■ Analysis begins with the principle that the fifth amendment privilege against compelled self-incrimination protects grand jury witnesses from having to furnish testimony that may provide the evidentiary basis to convict them in subsequent criminal trials. *U. S. v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977). This protection extends with equal force to instances where the witnesses are compelled to testify in criminal proceedings as well as in civil proceedings. *Compare Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.3d 562 (1967) (criminal) *with Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (civil proceedings). Thus the witness in either circumstance is justified in "refus[ing] to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Lefkowitz v. Turley*, 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 282 (1973).

■ But the protections afforded by the self-incrimination clause go beyond forbidding the government to use testimony obtained by compulsion to convict the speaker. The privilege equally restrains the government from coercing the witness into making the choice between exercising the privilege and risking the burden of some governmental sanction. This prohibition prevents the state from threatening a citizen with the loss of his license to do business unless he surrenders his constitutional privilege to remain silent. *Spevack v. Klein, supra*, 385 U.S. at 516, 87 S.Ct. at 628–629, 17 L.Ed.2d at 578 (1967) (plurality

opinion). The reasoning is that in the case of the citizen no urgent countervailing interest warrants imposing a cost on the unfettered exercise of his fifth amendment guarantee. *Id.* at 519–20, 87 S.Ct. at 630–631, 17 L.Ed.2d at 580 (concurring opinion).

■ This situation differs markedly however in the case of the public employee and, for this reason, a significantly narrower rule applies. The distinction is born of the fact that the government employee, unlike the ordinary citizen, is a "trustee of the public interest" and, because of this, the state has an important interest in obtaining from him answers to "questions specifically, directly and narrowly relating to the performance of his official duties." *Gardner v. Broderick*, 392 U.S. 273, 277, 278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082, 1086 (1968). This interest in securing from government employees an accounting of their public trust by no means justifies the state in totally abridging the fifth amendment rights of public employees. But it does justify the imposition of some burdens on the privilege. The demarcation line between the permissible and impermissible is plainly set out in a line of cases beginning with *Gardner*. There, a police officer appeared before a grand jury investigating job-related misconduct under circumstances that threatened him with removal unless he surrendered his privilege by answering the questions asked of him and at the same time waived his fifth amendment immunity against having this testimony used against him in a later criminal prosecution. When he refused to comply, the government, wrongly in the Court's estimation, removed him from his post. The objectionable feature of this action was not that the officer suffered dismissal as a consequence of choosing to remain silent. The effectuation of the government interest in obtaining an accounting from public employees was deemed sufficient to justify the burden on the privilege occasioned by removal. *Id.* at 278–79, 88 S.Ct. at 1916, 20 L.Ed. at 1082–83. Rather, the impermissible aspect consisted of the attempt to coerce the officer into "waiv[ing] his immunity with respect

to the use of his answer or the fruits thereof in a criminal prosecution of himself." *Id.* *See also id.* at 285, 88 S.Ct. at 1920, 20 L.Ed.2d at 1088 (concurring opinion).

This distinction between, on the one hand, permissibly burdening the choice to remain silent and impermissibly compelling outright waiver of the immunity conferred by the privilege, on the other, has drawn repeated approval in the cases that have arisen subsequent to *Gardner.* . *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), invalidated the removal of municipal workers who, on the threat of losing their jobs, refused to sign waivers surrendering their fifth amendment immunity. · Similarly, the distinction drawn in *Gardner* was applied in *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) and *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) to strike down rules that imposed the forfeiture of government contracts and political office unless the parties gave up both their right to remain silent *and* the immunity that goes along with it.

▪ These cases however do not control here. In this case, in sharp contrast to the situation involved in *Gardner, Sanitation Men, Turley* and *Cunningham,* no effort was made to compel plaintiff into giving up his fifth amendment immunity or else risking the loss of his livelihood. Rather, plaintiff here was faced with a choice of entirely different dimensions. He could have either contested his proposed removal by disclosing information about the pending criminal charges and in the process exposed himself to potential self-incrimination, or as he did, he could have chosen to remain silent and thereby sacrificed his right to a hearing and, through that, the chance of retaining his job. No waiver of fifth amendment immunity was compelled. To be sure, this choice placed plaintiff on the horns of a dilemma and burdened him in the exercise

of his fifth amendment right to remain silent. But under *Gardner* and its progeny the choice that plaintiff was faced with simply did not rise to constitutional proportions. No constitutional impediment prevented the government from discharging Pinkney "for refusing to divulge to appropriate authorit[ies] information pertinent to the faithful performance of [his] offic[e]." *Gardner v. Broderick, supra,* 392 U.S. at 285, 88 S.Ct. at 1920–21, 20 L.Ed.2d at 1088 (concurring opinion).

The resolution of this constitutional question does not entirely dispose of the fifth amendment claim in this case. The remaining issue is whether and in what manner the appeal process established by Board Resolution 70–1 should be construed to take account of the fifth amendment predicament faced by employees who, like Pinkney, are being prosecuted for criminal offenses and at the same time are being disciplined for misconduct in office. Given the continuing stigma that attaches to removal on the grounds of misconduct, the Court is convinced that the available procedures for contesting disciplinary actions should be broadly read to provide these employees an opportunity to clear their names and reputations.[38] In the Court's estimation, these procedures should not be construed, as the Board apparently read them in this case, to deny administrative hearings to employees, who, like plaintiff, awaited the outcome of criminal prosecutions before promptly appealing the disciplinary action taken against them.

The reason for this conclusion is straightforward. Provisions of Board Resolution 70--1 give subject employees the right to appeal decisions demoting, suspending and removing them. But the regulation does not place limitations on the time within which appeals have to be taken. Despite the uncertainty in this regard, the Board deemed plaintiff's bid for reinstatement to be untimely.[39] As the Board stressed: "Al-

---

**38.** *Cf. Codd v. Velger,* 429 U.S. 624, 633–635, 97 S.Ct. 882, 887–888, 51 L.Ed.2d 92, 100–101 (dissenting opinion) (1977) (purposes served by termination hearings include giving employees

discharged for cause the opportunity to vindicate their reputations).

**39.** Plaintiff's Exhibit Q.

though no time limit is set forth in Resolution No. 70–1 for filing an appeal, [the Personnel Committee of the Board] believes that the expiration of one year following your dismissal is too long a delay in filing an appeal. . . . The Committee has recommended, and the Board approved, that the appeal is not timely. Your request is, therefore, denied." [40]

In the Court's view, this reading of Resolution 70–1 wrongly failed to take account of the fact that plaintiff was not in a position to contest his dismissal until after the ongoing criminal prosecution was concluded. A proper regard for this understandable disability, particularly in light of the remedial purposes of Board Resolution 70–1, should have led the Board to convene a hearing to consider the case on the merits.

 This is not to suggest that the Board is obligated to entertain appeals regardless of when they are taken. On the contrary, timeliness is an important consideration in determining whether appeals should be entertained, in that an unnecessarily long delay will assuredly hinder the fact-finding process and in the process prejudice the employing authority. In instances where prejudice results, untimeliness rightly excuses the obligation to process the appeal. But where, as here, the delay in noting an appeal was kept to a minimum and, beyond this, was traceable to the assertion of fifth amendment rights, the uncertainty created by Resolution 70–1 in regards to taking appeals should not be held against the employee so as to deny him the chance to present his side of the case. This is especially so where, as in this case, the subject to be aired is a matter of enduring importance to the employee.

## IV. *Relief*

The question of appropriate relief is easily resolved by taking account of the injuries that Pinkney wrongfully sustained. The Court has found these to be breach of contract and the wrongful denial of Pinkney's right to appeal his termination. Plaintiff claims that he is entitled to reinstatement with back pay and accompanying benefits, adjustment of his personnel file and lost wages from the date of his termination. In the Court's view, however, the breadth of this relief greatly exceeds the scope of defendants' wrongful conduct.

 As to the contract claim, the Court has found that the College improperly deprived Pinkney of the benefits of his employment agreement. Thus plaintiff is justly entitled to an award of back pay from the effective date of his termination on May 3, 1974 to June 30, 1974, the date on which the contract would have expired had the College not acted to terminate it prematurely. Pinkney however is not entitled to an award of reinstatement. While the indictment against him did not constitute grounds for removal *under the contract*, once the contract *had expired*, the College was free to decide not to reappoint plaintiff if it so chose. Hence to award Pinkney reinstatement and lost wages despite this would be to assume, wrongly, that if the College had not terminated the agreement prematurely, it automatically would have chosen to renew it. The assumption is still mistaken even though the removal for cause would no doubt have played a part in the renewal decision. *Cf. Mt. Healy City Board of Education v. Doyle*, 429 U.S. 274, 284–286, 97 S.Ct. 568, 574–575, 50 L.Ed.2d 471, 482–83 (1977). A fair assessment of the undisputed facts indicates that the College would have taken just the opposite course, and decided against renewing the agreement.

 The wrongful denial of Pinkney's right to a post-termination hearing similarly does not justify awarding the array of remedies he seeks. This denial deprived plaintiff of the opportunity to clear his name and, through that, the chance of convincing appropriate authorities that he should be retained in the College's employ despite the indictment against him. In the Court's view, the nature of this deprivation counsels remanding the case back to the

40. *Id.*

**536**

Board since it, not the Court, is the body charged with the responsibility of making personnel decisions according to the best interests of the College. This Court can however guarantee that the process for rendering this decision is fair. An appropriate order will be issued of even date herewith.

## V. *Conclusion*

The foregoing opinion shall constitute the necessary findings of fact and conclusions of law.